UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

In the Matter of the Extradition of )
) Case No. 21-mj-4149
Riccardo Paolo Spagni a/k/a Ricardo Paolo Spagni ) U.S. Magistrate Judge Alistair Newbern

## AFFIDAVIT

I the undersigned,

## STEPHEN GEORGE MAY

state under oath,

1. I am an adult male attorney, with South African identity number 870427 5144 08 6, practicing as such under the name and style of Stephen G. May Attorney at 5 Sturdee Avenue, Rosebank, Johannesburg.

2. I have been practicing, *inter alia*, criminal and administrative law in South African criminal courts for just under 10 years.

3. I have represented over 40 (forty) individuals accused of criminal conduct in South African criminal courts.

4. The content of this affidavit falls within my own knowledge and is, to the best of my knowledge, true and correct. Submissions of a legal nature are made after diligent and careful consideration of, and citing, South African statute and case authority. Verification of the citation of the various sources can be done by a simple Google search, alternatively by consulting the free online database known as SAFLII.[1]

5. I am instructed that an undated letter, penned by the Director of Public Prosecutions, Western Cape (hereinafter, "the DPP, Western Cape") to the United States Department of Justice,

---

[1] http://www.saflii.org/

{02274781.1} Page **1** of **17**



Criminal Division, Office of International Affairs has, in response to a bail application brought by Mr Spagni, already been presented to the District Court for the Middle District of Tennessee, in the United States of America (hereinafter, "the above Honourable Court").

6. Whilst I am not certain whether this has in fact happened, I was approached to depose to this affidavit, in the interests of *audi alteram partem*, so as to give the Honourable Court as wide and objective a declaration of the South African statute and case authorities as possible, so as to enable the Honourable Court to arrive at a rational and informed decision in the present matter.

7. I have sought to discharge this mandate with reference to:

   7.1. the specific facts of this matter, as they have been described to me;

   7.2. the Extradition Treaty Between the Government of the United States of America and the Government of The Republic of South Africa ("the Treaty");

   7.3. the submissions of Mr Montminy, the United States Attorney's Office representative, contained in his memorandum filed of record in this Honourable Court on 21 July 2021, annexed hereto, marked "**SGM1**"; and

   7.4. the undated letter of the DPP, Western Cape dated, annexed hereto marked annexure "**SGM2**" for the Honourable Court's ease of reference.

8. The undated letter of the DPP, Western Cape ("**SGM2**") is highly misleading, and it is my view that it does not place this Honourable Court in information as would enable it to arrive at a rational, reasonable and informed decision.

9. In South African law, a prosecutor has a duty of disclosure which is illustrated by consideration of the principle that a prosecutor is not a persecutor.
{02274781.1 }Page **2** of **17**



10. Accordingly, a prosecutor should present his or her case to a court before which it leads a matter following the following principles:

   10.1. a prosecutor must disclose all information that he/she has at his/her disposal accurately, whether the information favours the prosecution or the defence;

   10.2. a prosecutor should strive to satisfy the Constitutional mandate imposed on him or her that a suspect or accused should have a fair trial.

11. The DPP, Western Cape would have the same duty of disclosure to this Honourable Court as it would have towards a South African court – a duty of which it has fallen woefully short, to the extent that what has been said her missive should, in my respectful submission, be discounted to the lowest evidential threshold.

12. While I do not respond to the DPP's letter *ad seriatim* in its entirety, I will deal with its various inconsistencies, incorrect allegations and vacuums of disclosure to remedy the problem and thus place this Honourable Court in sufficient information so as to enable it to discharge its own duty in arriving at an informed decision.

13. It is significant that the allegation is made that "Cape Cookies" laid a complaint with the South African Police Service ("SAPS") in November 2011, registering an "inquiry", while a docket – the name for the dossier of any enquiry or investigation by the SAPS which – was only registered some 9 months later in August 2012.

14. It is clear that the SAPS knew of the allegations against Spagni in 2011, had a year to investigate them, and only opened a docket in August 2012. In this regard:

   14.1. this is in itself irregular because:

14.1.1. according to SAPS' standing orders, a docket must be opened immediately upon a complaint by a member of the public;

14.1.2. the reasons for this is that, at every watershed moment of their investigation, the SAPS perform administrative law acts;

14.1.3. every same watershed moment should be recorded, in detail, in the "investigation diary" in the "C" Section of the docket so that there is a record in terms of which the lawful – or otherwise – steps taken by the SAPS officer can be examined for accountability purposes;

14.1.4. the assessment of the lawfulness and reasonableness of these acts, as confirmed by their standing orders, is directed at determining the admissibility of the evidence of the State's case;

14.1.5. the use of the term "enquiry" by the DPP is a mere attempt at redefining the process, so as to avoid scrutiny and accountability for a substantial period of the investigation against Mr Spagni;

14.2. in other words, the investigation was conducted with impunity between November 2011 and August 2012; and

14.3. no one forced the DPP to express the procedural history of this matter in the terms she has, but it would be clear from what she has said, that:

14.3.1. the DPP must have an uneasiness about the conduct of the investigation up till now; and



14.3.2. the United States Attorney representatives would thus be uneasy about accepting that the charge against Mr Spagni is reasonably and rationally justified, as is required by administrative law principles.

15. The late appearance of the docket in August 2012 immediately preceded Mr Spagni's arrest and formal warning on 13 September 2012.

16. In this regard:

    16.1. it is known from what is said above that the arrest could not have been based on the "enquiry", which was obviously not recorded in the docket;

    16.2. the "safeness" of the arrest should thus be doubted. This is confirmed by the very next fact raised by the DPP, namely the withdrawal of the matter;

    16.3. a withdrawal in this manner is not a graceful nod towards the principles of liberty and the presumption of innocence, but could only point towards the unlawfulness of both the arrest and the enrolment of the matter at court;

    16.4. when this happened to Mr Spagni, his rights to dignity, reputation and liberty were egregiously trampled upon;

    16.5. in fact, these steps taken by the DPP amount simply of the harassment of Mr Spagni – perhaps in the hope of conscripting him to testify against himself.

17. Enrolment of a matter at court, and thus the charging of the accused, can only be premised upon a *prima facie* case with reasonable prospects of success of securing a conviction, beyond a reasonable doubt, upon admissible evidence.

18. If the sanctity of this decision was clear, it is inconceivable that the DPP, Western Cape would be so timid to disclose proof of it to this Honourable Court.

19. After the aforementioned withdrawal, there was a 5-year delay in finalising the investigation – which is not explained – and only thereafter, was the matter re-enrolled at court, when supposedly there must then have been a *prima facie* case against Mr Spagni.

20. As will be shown below, this is to be seriously doubted, given that the documentary evidence upon which the case was premised would age, be disposed of (or be lost in a fire, as in this case), the witnesses who generated it would retire, become untraceable and the case against the accused could only weaken – not, as the DPP appears to insinuate, get stronger – over a 5-year period of inactivity.

21. When the investigation was eventually – supposedly – deemed complete and a *prima facie* case against Mr Spagni had – supposedly – emerged, the Honourable Court would be mindful that Mr Spagni availed himself at the Cape Town Magistrates' Court, ready for trial on 24 August 2017.

22. There are four prospective methods by which an accused may be brought to court. They are: summons, warning, arrest and subpoena. It is not helpful for the decisions that this Honourable Court must make, that the DPP, Western Cape is unable or unwilling to say which one was used to secure Mr Spagni's attendance at court on 24 August 2017.

23. What is clear, however, is that arrest was never necessary and that Mr Spagni embraced the legal process and appeared on his own recognizance.

24. Without intentionally doing so, the faulty and irrational reasoning for the decision to charge, and enrol the matter to prosecute Mr Spagni, and thus the decision to request his extradition (which rests on the charge) is displayed very clearly.

25. At the outset, I wish to point out that the DPP has specifically stated that:

> *"Spagni's matter was transferred from the District Court in Cape Town to the Regional Court in Cape Town due to the fact that the District Courts in SA have limited jurisdiction and the offences with which Spagni was charged, attract heftier sentences."*

26. I am mindful that it was reported (see for example annexure "**SGM2**") that "Mr Spagni potentially faces up to 20 years imprisonment for his offences". Aside from the implicit assumption of guilt, which is Constitutionally inappropriate, this will be shown, in the course of this affidavit, to be totally incorrect.

27. I am mindful that when the DPP, Western Cape refers to the referral of this matter to the Regional Court, Cape Town due to its greater sentencing powers, she does not refer to the type of sentence she seeks to impose. She simply leaves the door open to the suggestion that this may be "hefty".

28. I would have thought that the DPP, Western Cape would have taken this Honourable Court into her confidence and indicated that the highly technical extent of the sentencing powers of the Regional Court and would further have indicated the onus on the Regional Court, Western Cape, to exercise its wide discretion may even impose a non-custodial sentence.

29. This would surely influence the decision that this Honourable Court would take on Monday, 9 August 2021.

30. Accordingly, I will attempt to summarise the type of sentence which Mr Spagni might receive in South Africa, in the event that he is convicted – which prospect is denied.

31. The purpose of this is to illustrate that Mr Spagni is not facing a high likelihood of incarceration, much less lengthy incarceration in the unlikely event that he is convicted.

32. Section 51, the Criminal Law Amendment Act 105 of 1997 (hereinafter, "the Minimum Sentences Act") provides as follows:



> *51. Discretionary minimum sentences for certain serious offences*
>
> *(1)   [...]*
>
> *(2)   Notwithstanding any other law but subject to subsections (3) and (6), a regional court or a High Court shall sentence a person who has been convicted of an offence referred to in-*
>
> > *(a)   Part II of Schedule 2, in the case of-*
> >
> > > *(i)   a first offender, to imprisonment for a period not less than 15 years;*
>
> *[...]*
>
> *Provided that the maximum term of imprisonment that a regional court may impose in terms of this subsection shall not exceed the minimum term of imprisonment that it must impose in terms of this subsection by more than five years.*
>
> *(3)(a)   If any court referred to in subsection (1) or (2) is satisfied that substantial and compelling circumstances exist which justify the imposition of a lesser sentence than the sentence prescribed in those subsections, it shall enter those circumstances on the record of the proceedings and must thereupon impose such lesser sentence [...]*

33. Schedule 2, Part II of the same Act contains the following which is the relevant provision relating to Mr Spagni:

> *Any offence relating to exchange control, extortion, fraud, forgery, uttering, theft, or an offence in Part 1 to 4, or section 17, 20 or 21 (in so far as it relates to the aforementioned offences) of Chapter 2 of the Prevention and Combating of Corrupt Activities Act, 2004-*
> *(a) involving amounts of more than R500 000,00;*
> *(b) involving amounts of more than R100 000,00, if it is proved that the offence was committed by a person, group of persons, syndicate or any enterprise acting in the execution or furtherance of a common purpose or conspiracy;*

34. There are many cases which delineate what would constitute "substantial and compelling circumstances" insofar as sub-section (3)(a) is concerned. Perhaps the best explanation would be:[2]

    34.1. the starting point is the discretionary minimum sentence as it is contained in the statute;

---

[2] S v Homareda 1999 (2) SACR 319 (W)

34.2. once the court is satisfied that substantial and compelling circumstances exist which justify the imposition of a lesser sentence, it is saddled with a judicial discretion to do so, which must be exercised rationally and carefully, in consideration *inter alia* of restorative justice and the liberty of the accused;

34.3. in deciding whether substantial and compelling circumstances exist, each case must be decided on its own facts and the court is required to look at all factors and to consider them cumulatively;

34.4. if the court concludes, in a particular case, that a minimum prescribed sentence is so disproportionate to the sentence which would have been appropriate, it is entitled to impose the lesser sentence.

35. What this would demonstrate to this Honourable Court is that a discretionary minimum sentence as provided for in section 51 of Act 105 of 1997 above:

   35.1. is just that: discretionary, not an automatic nor predetermined outcome, as the DPP would have it;

   35.2. imposes on a court, where substantial and compelling circumstances exist, a duty to exercise its discretion in a manner which favours restorative justice and the liberty of the accused;

36. These substantial and compelling circumstances are the jurisdictional facts for these conclusions are set out below.

37. This Honourable Court would be mindful that material mitigating factors already exist in this matter, for the imposition of a non-custodial sentence for the crimes with which Mr Spagni is charged, even if he is convicted. These would be, as things now stand:

37.1. Mr Spagni has always embraced the legal process, throughout the procedural history of the matter, on the DPP's own version;

37.2. the prosecution of this matter has been:

37.2.1. fraught with delays of almost a decade, during which time the strength of the State's case simply cannot have improved;

37.2.2. onerous, having on at least two occasions (besides this one) sought to deprive Mr Spagni of his liberty arbitrarily when there was no *prima facie* case against him; and

37.2.3. in and of itself, has amounted to nothing less a punitive process in terms of which Mr Spagni has been treated as if he were already convicted of a crime and thus ought to be punished.

37.3. cases of precedent, over a large spectrum of time, evidence instances on similar facts, where a sentence of correctional supervision has been imposed;

37.4. Mr Spagni would suffer from several medical conditions which would be taken into account in the type of sentence he would receive;

37.5. Mr Spagni is a first-time offender and, having no prior convictions, ought to be dealt with more leniently than a repeat offender and with the overriding objective of his rehabilitation rather than his oppressive punishment;

37.6. Mr Spagni is a productive member of society whose skillset is in high demand by his community, which would militate strongly in favour of a non-custodial sentence which would allow him to apply his skills to the community's benefit;

37.7. any further jurisdictional facts for the imposition of a lesser sentence would, at this stage, be a matter of speculation; and

37.8. a non-custodial sentence of correctional supervision is thus appropriate.

38. In any event, insofar as Mr Spagni's absence from the Regional Court, Western Cape is concerned, as is dealt with below – where the *audi alteram partem* applies – it is still available to Mr Spagni, to give a reasonable explanation for his absence and to be released on his own recognizance again.

39. I cannot think of a justifiable reason why the DPP, Western Cape would not disclose this to the Honourable Court. All that has to be done is that the present South African attorneys ought to be contacted, dates of appearance in court canvassed, on which dates the enquiry as to Mr Spagni's absence will be dealt with and the trial continue.

40. In the circumstances, on consideration of the neutral, uncontested evidence before this court, on the standard of a prudent man, <u>there is simply no prospect that the sentence that will be imposed will entail a deprivation of liberty for a year or more</u>.

41. It is telling, insofar as disclosure is concerned, that the DPP, Western Cape does not disclose the quantum, in respect of the alleged offence, which they hope to prove against Mr Spagni.

42. On the facts of Mr Spagni's case, I respectfully submit that the sentencing options available to the Regional Court, Western Cape are indicative of the strong prospect that the likely sentence which would be imposed, in the event that he is convicted, which is a prospect which is denied, is a non-custodial sentence of a fine and/or a suspended sentence and/or correctional supervision.

43. Of these three prospects, correctional supervision is the "heftiest" that might be imposed, and accordingly I will address the Honourable Court on that prospect alone.

{02274781.1 }Page **11 of 17**

44. I do this because the principles that surround a fine and/or suspended sentence are explained by the words themselves.

45. A South African court, wishing to impose a sentence of correctional supervision, directs itself towards Sections 276 and 276A of the Criminal Procedure Act 51 of 1977, read with the aforementioned Minimum Sentences Act, the relevant portions of which provide:

*276 Nature of punishments*

*(1) Subject to the provisions of this Act and any other law and of the common law, the following sentences may be passed upon a person convicted of an offence, namely—*

   *[...]*

   *(h) correctional supervision;*

   *[Para (h) added by s 41(a) of Act 122 of 1991.]*

   *(i) imprisonment from which such a person may be placed under correctional supervision in his discretion by the Commissioner.*

   *[Para (i) added by s 41(a) of Act 122 of 1991 and substituted by s 20 of Act 87 of 1997.]*

   *[...]*

*(3) Notwithstanding anything to the contrary in any law contained, other than the Criminal Law Amendment Act, 1997 (Act 105 of 1997), the provisions of subsection (1) shall not be construed as prohibiting the court—*

   *(a) from imposing imprisonment together with correctional supervision; or*

   *[...]*

*276A Imposition of correctional supervision, and conversion of imprisonment into correctional supervision and vice versa*

   *[...]*

*(3) (a) Where a person has been sentenced by a court to imprisonment for a period—*

   *(i) not exceeding five years; or*

   *(ii) exceeding five years, but his date of release in terms of the provisions of the Correctional Services Act 8 of 1959, and the regulations made thereunder is not more than five years in the future,*

*and such a person has already been admitted to a prison, the Commissioner or a parole board may, if he or it is of the opinion that such a person is fit to be subjected to correctional supervision, apply to the clerk or registrar of the court, as the case may be, to have that person appear before the court a quo in order to reconsider the said sentence.*

*[Para (a) amended by s 46(a) of Act 129 of 1993 and by s 21(a) of Act 87 of 1997.]*

46. As is the modern tendency in most jurisdictions, restorative justice is one of the most important considerations in sentencing a convicted person.

47. A South African court on sentencing will distinguish between two types of offenders those who ought to be removed from society, by means of imprisonment and those who, although deserving of punishment, should not be removed from society.[3]

48. Correctional Supervision has been imposed in South Africa where the facts were similar to those which the DPP, Western Cape seeks to prove beyond a reasonable doubt against Mr Spagni – the prospect of which is denied.

49. While the prospects of these being proved against Mr Spagni are denied, even if the DPP, Western Cape were successful, it is likely that Mr Spagni would not be directly incarcerated in a South African correctional facility.

50. In the matter of *S v Van der Westhuizen*[4] the accused, a 42-year-old marketing manager, bought two vehicles, a canopy for a "bakkie" (a pickup truck) and a trailer on hire-purchase using a false name. Mr Van der Westhuizen had numerous previous convictions (which is not the case here for Mr Spagni) and had already served long periods of imprisonment. However, the last conviction for fraud was 12 years before the present conviction. A sentence of 4 years imprisonment in terms of section 276(1)(i) was imposed on appeal.

---

[3] *S v R* 1993 (1) SACR 2009 (A); *S v Grobler* 2015 (2) SACR 2010 (SCA) at paragraph [12]
[4] 1994 (1) SACR 191 (O)

51. In the *S v Grobler*,[5] Mr Grobler was sentenced to 5 years imprisonment in the High Court, whereupon the Supreme Court of Appeal set aside this sentence and reimposed the correctional service sentence imposed by the learned Magistrate in the Regional Court. In that matter, the appeal court placed the appellant on correctional supervision combined with 5 years' imprisonment which period of imprisonment was wholly suspended on condition that the accused paid back R 1, 500 000.00 to the complainants in the matter. Whilst imposing this sentence, the Honourable Court stated that the conclusion that the appellant would go "scot-free" was devoid of any factual foundation. The Honourable Court found further that it took into account that the original charges were only laid down in 2000, and he was only convicted in 2010. It found that the emotional and mental suffering that the accused had endured during this period could not be ignored. Furthermore, it found that the accused had, during this long period of time, been an economically active member of society. It further found that all the complainants could only be paid for their losses if the appellant was permitted to remain economically active. In this matter, the accused was a first offender convicted of 11 counts of fraud totalling a value of R1, 500 000.00. This Honourable Court would, I respectfully submit, realise that the facts of this case which was dealt with by the apex court (for non-Constitutional issues) bears a striking resemblance to the facts which the prosecution wishes to prove against Mr Spagni – the prospects of which are remote.

52. In *S v Flanagan*,[6] the accused was a bank clerk who unlawfully transferred R8, 500 000.00 from one bank account to another. Her case was that she had been forced by her husband to commit fraud, that she was 31 years of age, the mother of three minor children and had one previous conviction for theft of groceries. The sentence of 7 years imprisonment, of which 2 years were suspended, was set aside on appeal and replaced with a sentence of 4 years in terms of the correctional supervision regime.

---

[5] 2015 (2) SACR 210 (SCA)
[6] 1995 (1) SACR 13 (A)

53. What has been demonstrated is that, since the new dispensation in South Africa, and since the device of correctional supervision has been introduced, over this span of time, where the facts are very similar to the allegations placed before this court, disputed as they may be, it is the standard practice in South Africa to impose a non-custodial sentence, where the most severe instance of this is correctional supervision.

54. The relevant sections of the South African Bill of Rights as contained in Chapter 2 of the Constitution, at Section 35 are recorded to indicate that:

    54.1. guidance has been taken from the Constitution of the United States as it relates to due process and fair trial rights;

    54.2. the South African prosecutor – the DPP, Western Cape – has a duty to comply with these requirements in any of his or her conduct when he or she performs any professional duty. This would include any representations to the Honourable District Court for the Middle District of Tennessee.

55. There are two possible crimes which the South African authorities might have used to trigger these extradition proceedings:

    55.1. it has already been canvassed above that the crime of "fraud" with which Mr Spagni has been charged carries a likely sentence of correctional supervision, which amounts to a non-custodial sentence, which does not amount to a "deprivation of liberty"; and

    55.2. the other offence, and the actually jeopardy for which Mr Spagni stands accountable is a contravention of the Section 170 of the South African Criminal Procedure Act (Act 51 of 1977), which is quoted for the Honourable Court's ease of reference:

    *170 Failure of accused to appear after adjournment or to remain in attendance*

    *(1) An accused at criminal proceedings who is not in custody and who has not been released on bail, and who fails to appear at the place and on the date*

> *and at the time to which such proceedings may be adjourned or who fails to remain in attendance at such proceedings as so adjourned, shall be guilty of an offence and liable to the punishment prescribed under subsection (2).*
>
> *(2) The court may, if satisfied that an accused referred to in subsection (1) has failed to appear at the place and on the date and at the time to which the proceedings in question were adjourned or has failed to remain in attendance at such proceedings as so adjourned, issue a warrant for his arrest and, when he is brought before the court, in a summary manner enquire into his failure so to appear or so to remain in attendance and, unless the accused satisfies the court that his failure was not due to fault on his part, convict him of the offence referred to in subsection (1) and sentence him to a fine not exceeding R300 or to imprisonment for a period not exceeding three months.*

56. A study of the provisions of these sections reveal that:

    56.1. as a matter of due process and a fair hearing an accused is entitled to an enquiry, to explain his non-attendance before the Regional Court, Cape Town;

    56.2. it is significant that, until this enquiry is heard and the court has been satisfied by, or rejected, the accused's explanation, no crime has been yet committed;

    56.3. this enquiry has not yet taken place;

    56.4. I am instructed by the attorney representing Mr Spagni in South Africa, Mr Duncan Okes, that Mr Spagni has a reasonable explanation for his absence from the Cape Town Regional Court; and

    56.5. in any event, the penalty flowing from an adverse finding in this regard is a mere:

        56.5.1. R300.00 (three hundred Rand), which amounts to roughly $20.50 (twenty US Dollars); **or**

        56.5.2. 3 (three) months imprisonment.

57. The take-home point here is that the punishment is so insignificant as to be trivial, and does not trigger the Extradition Treaty because the crime:



57.1. has not yet been committed until the presiding officer in that court has rejected the explanation proffered by the accused; and

57.2. falls below the threshold in Article 2, which triggers the Extradition Treaty.

58. It is of seminal importance that the DPP, Western Cape did not disclose these facts to the United States Attorney's Office and Mr Joseph P. Montminy, who represents the South African Government before this Honourable Court.

59. For the reasons set out above, it is my view that the South African authorities' presentation before this Honourable Court is fundamentally flawed and, in fact, the most serious punishment Mr. Spagni is likely to receive if convicted of the allegations pending against him would be a non-custodial sentence.

_____
DEPONENT

SIGNED AND SWORN TO BEFORE ME AT _Morningvil_ ON THIS _9_ DAY OF _August_ (MONTH) _2021_ (YEAR), THE DEPONENT HAVING ACKNOWLEDGED IN MY PRESENCE THAT HE KNOWS AND UNDERSTANDS THE CONTENTS OF THIS AFFIDAVIT, THE PROVISIONS OF GOVERNMENT GAZETTE R1478 OF 11 JULY 1980 AS AMENDED BY GOVERNMENT GAZETTE R774 OF 20 APRIL 1982, CONCERNING THE TAKING OF THE OATH, HAVING BEEN COMPLIED WITH.

_____
COMMISSIONER OF OATHS

CAPACITY:

FULL NAMES: ADHIR JUGOO
COMMISSIONER OF OATHS
PRACTISING ATTORNEY

ADDRESS: 19 SPARROW AVENUE,
VORNA VALLEY, MIDRAND, 1686
CELL: 079 641 4232