UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA,

v.

RICCARDO PAOLO SPAGNI

Case No. 3:21-mj-4149

Magistrate Judge Alistair E. Newbern

## MEMORANDUM OF EXTRADITION LAW AND
## REQUEST FOR CERTIFICATION OF EXTRADITION

Riccardo Paolo Spagni ("Spagni" or the "fugitive") has been charged in the Regional

Court of the Western Cape Division sitting at Cape Town, South Africa with the offenses of

common law fraud (or, in the alternative, violations of section 59(1)(h) of the Value Added Tax

Act, No. 89, of 1991), common law forgery, and common law uttering.  South Africa seeks his

extradition.  The United States, acting at the request of South Africa, began the extradition

proceeding against Spagni, and the Court has set an extradition hearing for March 4, 2022.  As

set forth herein, the requirements for extradition certification have been satisfied, and this Court

should certify the extradition request to the Secretary of State.

## I.      BACKGROUND

On July 21, 2021, this Court issued an arrest warrant for Spagni pursuant to a request

from South Africa under the authority of the Extradition Treaty Between the Government of the

United States of America and the Government of the Republic of South Africa, U.S. – S. Afr.,

Sept. 16, 1999, S. TREATY DOC. NO. 106-24 (2000) (the "Treaty").[1]  On that same date, July 21,

2021, Spagni was arrested at the Nashville airport on a private charter jet that had arrived from

---

[1] Copies of the Treaty, South Africa's extradition request, and the Declaration of Michael J.
Giles are attached as Exhibit 1.

New York for fueling on the way to Los Cabos, Mexico; and Spagni was transported to his initial court appearance, at which time the Court ordered him detained. (DE#8, Minute Entry). The Court conducted a detention hearing in early August, 2021, and Spagni was ordered detained. (DE#14, 16, Minute Entry; DE#17, Order of Detention). The Court subsequently held status conferences on September 17, 2021 and September 20, 2021 and addressed the fact that U.S. State Department had not yet received a formal extradition request from South Africa within 60 days of Spagni's provisional arrest. (DE#21, 23, Minute Entry of Status Conferences). Consequently, the Court ordered Spagni's release with conditions. (DE#24, Order of Release).

The United States seeks Spagni's extradition in accordance with its treaty obligations to South Africa. Statute requires the judicial officer handling the extradition to hold a hearing to consider the evidence of criminality that South Africa has presented and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If the judicial officer finds the fugitive extraditable, the court certifies that conclusion to the Secretary of State, who decides whether to surrender the fugitive. Because the law regarding extradition is *sui generis*, differing substantially from ordinary criminal or civil proceedings, the United States offers this memorandum as a guide to the nature of the extradition hearing and the Treaty's application to the facts of this case. As detailed here, the evidence submitted by South Africa fulfills the relevant Treaty requirements. The Court should therefore "certify the same" to the Secretary of State, who will then decide whether to surrender Spagni "according to the treaty." *Id.*[2]

---

[2] After the Court completes its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993). "The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations, which an extradition magistrate may not." *Id.*

## II.    STATEMENT OF FACTS

Authorities in South Africa seek Spagni's extradition for the offenses of common law fraud (or, in the alternative, violations of section 59(1)(h) of the Value Added Tax Act, No. 89, of 1991), common law forgery, and common law uttering.  The offenses were committed within the jurisdiction of South Africa.  On April 19, 2021, the Magistrate Court of the District of Cape Town, South Africa, issued a warrant for Spagni's arrest.  According to the materials South Africa has provided:

Spagni was employed by Cape Cookies CC ("Cape Cookies") from October 1, 2009, to June 8, 2011, as its Information Technology Manager (IT Manager).  Spagni's employment with Cape Cookies terminated by mutual agreement.  Witness statements and bank and business records reflect the following:

As the IT Manager of Cape Cookies, Spagni received invoices for IT-related goods and/or services that Cape Cookies received.  Ensync Network Solutions was an IT supplier for Cape Cookies.  Spagni was responsible to validate the Ensync invoices he received and present them to the accounts section of Cape Cookies to ensure that the amounts due would be paid to Ensync.  Spagni, however, intercepted the invoices that Ensync issued to Cape Cookies for IT-related goods and/or services.  Spagni forged similar invoices using false information purporting to be from Ensync.  On these invoices, Spagni inflated the prices for the purported goods and/or services.  He also included an invalid VAT number for Ensync, which would result in payment inclusive of VAT by Cape Cookies that would enable Cape Cookies to obtain an improper VAT refund.  Further, Spagni did not list the true bank account of Ensync but, rather, an ABSA account (formerly Amalgamated Banks of South Africa) that Spagni held.  Spagni deliberately presented these forged invoices to the accounts department of Cape Cookies for payment,

3

intentionally misrepresenting to Cape Cookies that 17 such invoices had been issued by Ensync for actual services rendered and/or goods delivered. Cape Cookies acted on the authority of Spagni and paid the fictitious invoices that he had submitted for payment by means of electronic funds transfer into the bank account Spagni had specified. The first set of South Africa's charges against Spagni (Counts 1-51) pertains to the fictitious Ensync invoices. The Charge Sheet includes a spreadsheet (Schedule 1) documenting the Ensync invoices that Spagni forged and presented to Cape Cookies, which Cape Cookies paid into an ABSA account held by Spagni on 17 instances between May 4, 2010 and May 31, 2011. The columns on the spreadsheet provide details including, for each invoice, the date, the purported service provider, the total amount, the VAT portion, and the ABSA account number the invoice stipulated.

In similar fashion, between November 2009 and May 2011, Spagni generated and presented to Cape Cookies false invoices purporting to be from three additional suppliers of information technology goods and services – DarkCube Biometrics CC, Juran Trading SolidSource, and StorVault Africa. In fact, these were phony invoices. The invoices purportedly from DarkCube listed a registration number that actually belonged to Dust Technology CC, an entity in which Spagni had 50 percent shares, according to South Africa's Company Registrations Office. Juran Trading SolidSource and StorValut Africa, moreover, were fictitious entities. (The names Jarun Trading CC, SolidSource, and StorVault Africa were not registered.) All of these purported invoices listed addresses and telephone numbers that neither the detective nor the forensic investigator on the case could trace. The invoices also listed invalid VAT numbers, which would result in payment inclusive of VAT by Cape Cookies that would enable Cape Cookies to obtain an improper VAT refund. With these phony invoices, Spagni provided numbers for ABSA accounts that bank records reflect he, in fact, held. Spagni knowingly

submitted these phony invoices to Cape Cookies as though they were true and proper documents, intentionally misrepresenting that the invoices should be paid into the accounts he had specified.

The second set of charges against Spagni (Counts 52-261) pertains to the fictitious DarkCube invoices. As described above, the Charge Sheet includes a chart documenting the DarkCube invoices that Spagni forged and presented to Cape Cookies, which Cape Cookies paid into an ABSA account held by Spagni on 70 instances between November 30, 2009, and May 27, 2011 (*see* Charge Sheet Schedule 2). The third set of charges against Spagni (Counts 262-327) pertains to the SolidSource invoices that Spagni forged and presented to Cape Cookies, which Cape Cookies paid into an ABSA account held by Spagni on 22 occasions between March 26, 2010, and May 27, 2011 (*see* Charge Sheet Schedule 3). The fourth set of charges against Spagni (counts 328-78) pertains to the StorVault Africa invoices that Spagni forged and presented to Cape Cookies, which Cape Cookies paid into an ABSA account held by Spagni on 17 occasions between April 1, 2010, and May 11, 2011 (*see* Charge Sheet Schedule 4).

The materials from South Africa indicate that Spagni received a total of approximately 1,453,561.47 South African Rand by defrauding Cape Cookies.

In August 2017, Spagni was charged in the Western Cape Regional Court, Cape Town for the aforementioned offenses arising out of these facts. He pleaded not guilty to the charges. Trial against him commenced on August 22, 2019, and the proceedings continued on September 11-12 and November 20-22, 2019. (*See* DE 17, Memorandum Order, at 2). Spagni failed to appear in court for resumption of trial on March 24, 2021, and April 19, 2021. (*Id.* at 2). South African authorities attempted to locate Spagni at his home address and through contacts with his friends and family, but to no avail. In fact, Spagni had fled South Africa with an ultimate destination of the United States. The trial court issued a warrant for his arrest on April 19, 2021.

The Government of South Africa has submitted a formal request for extradition supported by the documents specified in the Treaty. Spagni remains on release with conditions in the Middle District of Tennessee.

## III.  LEGAL FRAMEWORK APPLICABLE TO EXTRADITION

### A.  <u>General Principles of International Extradition</u>

Extradition is primarily an executive function with a specially defined role for a judicial officer, who is authorized by statute to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge."  18 U.S.C. §§ 3184, 3186; *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993); *Lo Duca v. United States*, 93 F.3d 1100, 1110 n.10 (2d Cir. 1996); *Juarez-Saldana v. United States*, 700 F. Supp. 2d 953, 955 (W.D. Tenn.  Mar. 25, 2010) (citing *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997)).  The Secretary of State, and not the court, makes the ultimate decision regarding whether the fugitive should ultimately be surrendered to the requesting country.  *See* 18 U.S.C. §§ 3184, 3186; *Martinez v. United* States, 282 F.3d 451, 455 (6th Cir. 2016) (*en banc*); *Demjanjuk v. Petrovsky*, 776 F.2d 571, 584 (6th Cir. 1985), *vacated on other grounds*, 10 F.3d 338 (6th Cir. 1993); *In re Extradition of Bilanovic*, No. 1:08-mj-74, 2008 WL 5111846, at *5 (W.D. Mich. Dec 3, 2008) ("Extradition is an executive rather than a judicial function.").  "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch."  *Kin-Hong*, 110 F.3d at 110.

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of

extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *Charlton v. Kelly*, 229 U.S. 447, 461 (1913) (analogizing extradition hearing to a preliminary hearing in a criminal case); *see also In re Extradition of Drayer*, 190 F.3d 410, 415 (6th Cir. 1999) ("An extradition proceeding is not a forum in which to establish[] the guilt or innocence of the accused; rather, the sole inquiry is into probable cause."). If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the court and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. *See* 18 U.S.C. § 3184 (providing that following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made").

In fulfilling its function under Section 3184, the judicial officer should construe liberally the applicable extradition treaty in order to effect its purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 303 (1933) ("Extradition treaties are to be liberally, not strictly, construed."). As the Supreme Court explained in *Factor*:

> In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them.

*Id.* at 293; *see also, e.g.*, *Martinez*, 828 F.3d at 463 (stating that "default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"); *Grin v. Shine*, 187 U.S. 181, 184 (1902) (stating that a court should "interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories"). To carry out a

7

treaty obligation, the treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Id.* at 298. This country does not expect foreign governments to be versed in our criminal laws and procedures. *Grin*, 187 U.S. at 184. Thus, "[f]orm is not to be insisted upon beyond the requirements of safety and justice." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).

Additionally, a court should afford great weight to statements by the U.S. Department of State regarding treaty interpretation. *See El Al Israel Airlines*, *Ltd. v. Tseng*, 525 U.S. 155, 168 (1999); *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); *Ahmad v. Wigen*, 726 F. Supp. 389, 402 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990) ("The State Department's view deserves deference, unless it represents a substantial departure from national or international norms.").

**B.     Extradition Hearings Follow Unique Procedures**

**1.     An Extradition Hearing Is Not a Criminal Proceeding**

The purpose of an extradition hearing is to decide the sufficiency of the materials the foreign government has submitted to the United States in support of its extradition request, not to determine the guilt or innocence of the accused. *See, e.g.*, *Collins v. Loisel*, 259 U.S. 309, 316 (1922); *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Because of the limited nature of the hearing, special procedures apply. *See, e.g.*, *Martinez*, 828 F.3d at 455.

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These

rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *In re Extradition of Harusha*, No. 07-x-51072, 2008 WL 1701428, at *3 (E.D. Mich. Apr. 9, 2008); *Balzan v. United States*, 702 F.3d 220, 224 (5th Cir. 2012). For example, "hearsay is permitted and admissible" at an extradition hearing. *Harusha*, 2008 WL 1701428, at *4; *see also, e.g.*, *Collins*, 259 U.S. at 317; *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th Cir. 1977); *Demjanjuk*, 776 F.2d at 576 (relying on documentary evidence identifying the fugitive as a guard at an SS training camp).

Moreover, a fugitive generally has no right to discovery, s*ee, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005); *Montemayor Seguy v. United States*, 329 F. Supp. 2d 883, 889 (S.D. Tex. 2004), except in very limited circumstances. *See Demjanjuk*, 10 F.3d at 353-54 (applying *Brady v. Maryland*, 373 U.S. 83 (1963), to the facts of that extradition case, where the United States had conducted its own investigation of the offense underlying the extradition request); *Drayer*, 190 F.3d at 413-15 (holding that the United States fulfilled its discovery obligations by turning over materials in its possession, and that any items "that may be in the possession of Canada must be sought in a Canadian forum"); *Martinez*, 828 F.3d at 470 (finding government's discovery obligations satisfied by its representation that there was no exculpatory evidence in its possession, citing *Drayer*).

Furthermore, many Constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing or to confront his accusers. *See Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406-07 (9th Cir. 1988); *Ordinola v. Hackman*, 478 F.3d 588, 608 (4th Cir. 2007). There is no Sixth Amendment right to a speedy extradition. *See, e.g.*, *Harusha*, 2008 WL1701428, at *3*; McDonald v. Burrows*, 731 F.2d 294, 297 (5th Cir. 1984); *Martin*, 993

F.2d at 829; *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978).  The exclusionary rule is inapplicable.  *See Simmons v. Braun*, 627 F.2d 635, 636–37 (2d Cir. 1980).  And the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see Collins v. Loisel*, 262 U.S. 426, 429 (1923); *Harusha*, 2008 WL1701428, at *3 (citing *Neely*, 180 U.S. at 122)).

### 2. Extradition Hearings Rely on Written Submissions and Do Not Require Live Witnesses

A certification of extradition may be, and typically is, based on the authenticated documentary evidence and information that the government seeking extradition has provided. *See Collins*, 259 U.S. at 317 (stating that court may base certification on "unsworn statements of absent witnesses"); *O'Brien*, 554 F.2d at 783; *Demjanjuk*, 776 F.2d at 576 (finding that documentary evidence identifying the fugitive as a guard at an SS training camp was sufficient "to justify holding a person for trial in another place"); *Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008) ("[C]ourts have consistently concluded that hearsay is an acceptable basis for a probable cause determination in the extradition context.  Unsworn statements can be sufficient to support a probable cause determination.") (citations omitted).  Nothing more is required, and typically, nothing more is provided.  *See, e.g.*, *Bovio v. United States*, 989 F.2d 255, 259–61 (7th Cir. 1993) (finding Swedish investigator's statement sufficient to establish probable cause); *Shapiro v. Ferrandina*, 478 F.2d 894, 902-03 (2d Cir. 1973); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-1434 (S.D. Fla. 1993) (finding documents and statements sufficient for extradition to Honduras), *aff'd*, 28 F.3d 116 (11th Cir. 1994).  The finding may rest upon written statements from a foreign prosecutor or judge summarizing the evidence.  *Rice v. Ames*, 180 U.S. 371, 375–76 (1901); *accord Glucksman v. Henkel*, 221 U.S. 508, 513–14 (1911).  Extradition treaties do not require, or even anticipate, live witness testimony at the hearing. *See Artukovic v.*

10

*Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986).  Requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty."  *Bingham*, 241 U.S. at 517.

Federal statute and the applicable treaty govern the nature and admissibility of evidence at an extradition hearing.  In this case, Article 10 of the Treaty provides that documents submitted in support of an extradition request pursuant to Article 9 of the Treaty "shall be received in evidence in any proceedings for extradition if," among other things, such document is certified by the principal diplomatic or principal consular officer of the United States resident in the Republic of South Africa, as provided by the extradition laws of the United States."   Further, 18 U.S.C. § 3190 provides that documents "shall" be received and admitted into evidence at an extradition hearing "if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required."  Here, the government has provided as part of Exhibit 1, a declaration from Michael J. Gilles, an attorney in the Office of the Legal Adviser for the Department of State (the "Gilles Declaration").  As the Gilles Declaration states, the documents South Africa has submitted in support of extradition comply with 18 U.S.C. § 3190 because the principal consular officer of the United States in South Africa certified them.  (Gilles Decl. ¶ 6.)

### 3. The Fugitive's Evidence is Limited

Due to the narrow scope of an extradition hearing, which is not a trial, a fugitive's opportunity to challenge the evidence introduced against him is very circumscribed.  A fugitive may not introduce evidence that contradicts the materials the requesting country has submitted;

11

rather, he may only introduce evidence explaining the submitted evidence. *See Charlton*, 229 U.S. at 461-62; *In re Extradition of Basic*, No. 5:11-MJ-5002, 2012 WL 3067466, *at 2 (E.D. Ky. July 27, 2012); *In re Extradition of Hasani*, No. 2:14–mj–189, 2014 WL 4549232, *3 (S.D. Ohio Sept. 12, 2014) ("[O]nly evidence that explains the evidence submitted in support of extradition is admissible"). A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Harusha*, 2008 WL 1701428, at * 4 (quoting *Collins*, 259 U.S. at 316 (citations omitted)). Whether to admit explanatory evidence is largely within the court's discretion. *See In re Extradition of Demjanjuk*, 603 F. Supp. 1463, 1465 (N.D. Ohio 1984).

Courts routinely reject technical and affirmative defenses in extradition proceedings. *See Bingham*, 241 U.S. at 517 (rejecting objections that "savor of technicality"); *Harusha*, 2008 WL 1701428, at *5 ("[A]ffirmative defenses, including self-defense, are not relevant in extradition hearings and should not be considered) (citing *Charlton*, 229 U.S. at 462); *Collins*, 259 U.S. at 316–17. Likewise, a fugitive may not introduce evidence that seeks to impeach the credibility of the requesting country's witnesses. *See, e.g.*, *Bovio*, 989 F.2d at 259.

### 4. The Executive Branch Considers Matters Other Than Sufficiency; Rule of Non-Inquiry

Other than the sufficiency of the evidence, all matters that a fugitive may raise as defenses to extradition are to be considered by the Secretary of State, not by the court. *See* 18 U.S.C. §§ 3184, 3186. For example, the Secretary of State should consider a fugitive's contention that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Harusha*, 2008 WL 1701428, at *5; *Prasoprat*, 421 F.3d at 1016; *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991). This is consistent with the long-held understanding that deciding whether to

surrender a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the executive's powers to conduct foreign affairs. *In re Kaine*, 55 U.S. 103, 110 (1852).

## IV.  THIS COURT SHOULD CERTIFY THE EXTRADITION REQUEST

A court should certify to the Secretary of State that a fugitive is extraditable when the following five requirements are met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the treaty covers the offenses for which extradition is requested; and (5) sufficient evidence exists to support a finding of probable cause as to each offense. 18 U.S.C. § 3184; *See Fernandez*, 268 U.S. at 312; *In re Extradition of Robinson*, No. 3:11MJ7047, 2011 WL 6072102, at *1 (N.D. Ohio Oct. 21, 2011).

### A.  This Court Has Authority Over the Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing that Section 3184 prescribes does not exercise "any part of the judicial power of the United States" but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also Harusha*, 2008 WL 1701428, at *2.

### B.  This Court Has Jurisdiction Over Spagni

A court has jurisdiction over a fugitive found within its jurisdictional boundaries. *See* 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged."); *see Pettit v. Walshe*, 194 U.S. 205, 219 (1904); *Grin*, 187 U.S. at 185–86. Because Spagni was arrested in Davidson County, which is within this District, the personal jurisdictional requirement of 18 U.S.C. § 3184 is met.

### C.    The Treaty Is in Full Force and Effect

The extradition statute, 18 U.S.C. § 3184, provides for extradition where a treaty or convention is in force between the requesting state and the United States. *See, e.g.*, *In re Chan Kam-Shu*, 477 F.2d 333 (5th Cir. 1973), *cert. denied*, 414 U.S. 847 (1973); *Hoxha v. Levi*, 465 F.3d 554, 562 (3d Cir. 2006); *United States ex rel Saroop v. Garcia*, 109 F.3d 165, 171 (3d Cir. 1997). Here, the Gilles Declaration states that the Treaty is in full force and effect. The Department of State's determination is entitled to deference from the Court. *See Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight"); *Charlton*, 229 U.S. at 468; *Kastnerova v. United States*, 365 U.S. 980, 985–87 (11th Cir. 2004), *cert. denied*, 541 U.S. 1090 (2004).

### D.    The Treaty Covers the Offenses for Which South Africa Seeks Extradition

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances the treaty defines. Here, Article 1 of the Treaty provides for the extradition of "persons whom the authorities in the Requesting State have charged with or convicted of an extraditable offence." "An offence shall be an extraditable offence if it is punishable under the

14

laws in both States by deprivation of liberty for a period of at least one year or by a more severe penalty." *Id.* art. 2(1). Such dual criminality exists regardless of whether "the offence is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction ...." *Id.* art. 2(3)(b).

In assessing whether the Treaty covers the offenses for which South Africa seeks extradition, the Court should examine the description of the offense conduct that South Africa has provided and determine whether that conduct, if it had been committed here, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See, e.g.*, *Heilbronn v. Kendall*, 775 F. Supp. 1020, 1024 (W.D. Mich. 1991). A requesting country need not establish that its crimes are identical to ours. *See* Treaty art. 2(3)(a) (providing that an offense shall be extraditable regardless of whether "the laws in the Requesting and Requested States place the offence within the same category of offences or describe the offence by the same terminology"); *Demjanjuk*, 776 F.2d at 579 ("If the acts upon which the charges of the requesting country are based are also proscribed by a law of the requested nation, the requirement of double criminality is satisfied."). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312.

In fulfilling its function under § 3184, a court should construe liberally the applicable extradition treaty in order to effectuate its purpose, namely, to surrender fugitives to the requesting country. *Factor*, 290 U.S. at 298-300; *see also, e.g.*, *Martinez*, 828 F.3d at 463

15

(stating that "default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Because extradition treaties should be "interpreted with a view to fulfill our just obligations to other powers[,]" *Grin*, 187 U.S. at 184; *see Factor*, 290 U.S. at 303, the court should "approach challenges to extradition with a view towards finding the offenses within the treaty." *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez*, 828 F.3d at 463 ("The point of an extradition treaty after all is to facilitate extradition.").

Dual criminality exists in this case. South Africa seeks Spagni's extradition for the offenses of common law fraud (or, in the alternative, violations of section 59(1)(h) of the Value Added Tax Act, No. 89, of 1991), common law forgery, and common law uttering. South Africa's extradition request includes a sworn affidavit from Nicolette Astraid Bell, Acting Director of Public Prosecutions for the Western Cape. As Ms. Bell explains, the charged common law offenses carry a potential penalty of 15 years imprisonment. Under South African law, common law fraud consists of "unlawfully making, with intent to defraud, a misrepresentation which causes actual prejudice or which is potentially prejudicial to another." (Bell Aff. H1 ¶ 1). The essential elements of the offense are misrepresentation, prejudice (potential or actual), unlawfulness and intention to defraud. (*Id.*) The conduct underlying this offense, had Spagni committed the activity in the United States, would be subject to prosecution under laws including 18 U.S.C. § 1341 (mail fraud, punishable by 30 years imprisonment), 18 U.S.C. § 1343 (wire fraud, punishable by 20 years imprisonment), and/or Tenn. Code § 39-14-103(a) (theft of property, punishable as a Class B felony pursuant to Tenn. Code § 39-14-105(a)(5)).

The materials from South Africa explain that violation of section 59(1)(h) of the Value Added Tax Act, No. 89, of 1991, is charged as an alternative to common law fraud. The statute,

which carries a potential penalty of 60 months imprisonment, prohibits knowingly issuing a "tax invoice, credit note or debit note required under this Act which is in any material respect erroneous or incomplete." (Bell Aff. H4 ¶ 2 & Annex. F). Similar conduct in the United States would be subject to prosecution under 26 U.S.C. § 7201 (attempt to evade or default tax, punishable by 5 years imprisonment).[3]

The materials from South Africa explain that the offense of common law forgery consists of unlawfully and intentionally making a false document to the actual or potential prejudice of another, and the common law offense of uttering consists unlawfully and intentionally passing off a false document (forged) to the actual or potential prejudice of another. (Bell Decl. H2-H3). The conduct underlying this offense, had Spagni committed the activity in the United States, would be subject to prosecution under laws including Tenn. Code. § 39-14-114 (forgery, which the statute defines to include uttering, punishable as a Class E felony pursuant to Tenn. Code § 40-35-111(b)(5)). Accordingly, the Treaty covers all of the offenses for which South Africa seeks to extradite Spagni.

### E.    Probable Cause Exists to Believe that Spagni Committed the Offenses

To certify the evidence to the Secretary of State, the Court must conclude that probable cause exists to believe that the person before it committed the offenses for which extradition is sought. *See* 18 U.S.C. § 3184; Treaty art. 9(3)(c); *Demjanjuk*, 776 F.2d at 576; *see also Harusha*, 2008 WL 1701428, at *6 ("The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings."). The extradition

---

[3] *See also* Treaty art. 2(6) ("Where extradition . . . is sought for an offence against a law relating to taxation . . . or other revenue matters, extradition may not be refused on the ground that the law of the Requested State does not impose the same kind of tax or duty or does not contain a tax, customs duty, or exchange regulation of the same kind as the law of the Requesting State.").

judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

The evidence is sufficient, and probable cause exists, if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused. *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). The Supreme Court stated in *Benson v. McMahon* that:

> [T]he proceeding before the commissioner is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him.

127 U.S. 457, 463 (1888); *see also Fernandez*, 268 U.S. at 312 ("Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict."); *Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); *accord Ordinola*, 478 F.3d at 608 ("It is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate's probable cause hearing . . . . That is the task of the . . . courts of the other country.")

Here, the materials South Africa has provided establish probable cause to believe that Spagni committed the offenses for which South Africa seeks extradition. The materials from

18

South Africa include the sworn affidavit of Detective Sergeant Steven Pritchard, an investigating officer in the case, dated August 27, 2021 (the "Pritchard Affidavit"). The Pritchard Affidavit summarizes South Africa's evidence against Spagni and attributes the allegations in the Charge Sheet to various sources, including witnesses, bank statements, business records, government records, and research that Detective Pritchard and a forensic investigator on the case conducted. (*See* Pritchard Aff. ¶¶ 13-67).

The evidence pertaining to Counts 1-51 includes witness statements and corroborating bank statements (including electronic records from ABSA) that implicate Spagni as the beneficiary of funds transferred from Cape Cookies' bank account into Spagni's account. For example, Jade Naik, on behalf of Ensync, testified at Spagni's trial that the purported Ensync invoices did not originate from Ensync. At the same time, authentic invoices that Ensync issued to Cape Cookies were submitted to the trial court as exhibits. Ms. Naik highlighted in her evidence to the court the differences between the genuine Ensync invoices and the forged invoices with inflated amounts that Spagni presented to Cape Cookies for payment. Additionally, ABSA bank provided records pertaining to the ABSA account number that appeared on the forged invoices, reflecting that Spagni opened and was the holder of the ABSA account into which Cape Cookies deposited the funds. The scheme was discovered when Ensync contacted Cape Cookies to inquire about an unpaid invoice and supplied Cape Cookies with a copy of the unpaid invoice.

The Pritchard Affidavit also cites trial testimony from Lesley Slye, Cape Cookies' Financial Manager during the relevant period, who stated that although Cape Cookies could not locate the unpaid invoice, it did locate the forged Ensync invoices that Spagni had supplied to the accounts department for the period from May 2010 to May 2011, compared those with the one

19

Ensync forwarded, and noticed several inconsistencies, which led Cape Cookies to appoint a forensic investigator. Further, Detective Pritchard explains that because Ensync was registered for VAT with the South African Revenue Services (SARS), the genuine invoices Ensync issued to Cape Cookies were valid tax invoices, which were inclusive of 14 percent VAT. Likewise, because Cape Cookies was liable to pay the 14 percent VAT to Ensync, Cape Cookies was entitled to deduct the equivalent amount, as reflected on the bimonthly VAT return that Cape Cookies submitted to the SARS and regulated by the VAT Act 89 of 1991.

The evidence pertaining to the remaining counts includes investigative reporting from Detective Pritchard, witness statements, and corroborating bank and business records. For example, Detective Pritchard describes findings that the purported invoices from DarkCube, SolidSource, and StorVault listed unregistered entities or a false registration number, invalid VAT numbers, and untraceable contact information. Additionally, ABSA provided records pertaining to the ABSA account numbers that appeared on the forged DarkCube, SolidSource, and StorVault invoices, reflecting that Spagni opened and was the holder of the ABSA accounts into which Cape Cookies deposited the funds.

Moreover, Detective Pritchard notes that the evidence in support of the charges includes statements from (1) Gary Miller, a Director of Credence Forensic Services and a forensic accountant, who assisted Cape Cookies with the forensic investigation and produced a forensic accountant's report; (2) Dawid O. Roberts, who worked as a consultant for Cape Cookies when Spagni left the company; (3) Claudette Farmer, whom Cape Cookies employed as an accountant; and (4) Lynette Prinsloo on behalf of ABSA, concerning ABSA's records for Spagni's accounts and the money flow between the accounts.

In sum, this evidence, which South Africa cites, establishes probable cause to believe that Spagni committed the offenses of common law fraud (or, in the alternative, violations of section 59(1)(h) of the Value Added Tax Act, No. 89, of 1991), common law forgery, and common law uttering. Accordingly, South Africa's submissions in support of its extradition request establish probable cause to believe that Spagni committed the offenses for which extradition is sought.

## V.    CONCLUSION

For the foregoing reasons, the United States respectfully requests the certification of Spagni's extraditability to South Africa for the aforementioned offenses.

Respectfully submitted on January 31, 2022.

MARK H. WILDASIN
UNITED STATES ATTORNEY


By:    */s/ Joseph P. Montminy*
Joseph P. Montminy
Assistant United States Attorney
U.S. Attorney's Office
110 9th Avenue South, Suite A961
Nashville, Tennessee 37203-3870
(615) 736-5151
joe.montminy@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2022, I electronically served one copy of the response with the Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic Filing to the Defendant's counsel.


**/s/Joseph P. Montminy**
JOSEPH P. MONTINY
Assistant United States Attorney
110 9th Avenue South - Suite A-961
Nashville, Tennessee 37203-3870
Telephone: 615-736-5151

21