## DECLARATION OF MICHAEL J. GILLES

I, Michael J. Gilles, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser, Department of State, Washington, D.C. This office has responsibility for extradition requests within the Department of State, and I am charged with the extradition case of Ricardo Paolo Spagni. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and South Africa are found in the Extradition Treaty between the Government of the United States of America and the Government of the Republic of South Africa, signed September 16, 1999 (the Treaty). A copy of the Treaty is attached to this declaration.

3. In accordance with the provisions of the Treaty, the Department of International Relations and Cooperation of the Republic of South Africa has submitted to the U.S. Embassy in Pretoria Diplomatic Note No. CONS/0178/2021, dated September 21, 2021, formally requesting the extradition of Ricardo Paolo Spagni. A copy of the Diplomatic Note is attached to this declaration.

4. In accordance with Article 21 of the Treaty, the Government of the United States provides legal representation in its courts for South Africa in its extradition requests, and South Africa provides legal representation in its courts for extradition requests made by the United States.

5. The offences for which extradition is sought are extraditable offenses pursuant to Article 2 of the Treaty.

6. The documents submitted by the Government of South Africa in support of its extradition request were certified on September 23, 2021, by John Gimbel, Country Consular Coordinator of the United States of America in Johannesburg, in accordance with Title 18, United States Code, Section 3190. Mr. Gimbel, at the time of his certification, was the principal consular officer of the United States in South Africa.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October __8__, 2021, in Washington, D.C.


MICHAEL J. GILLES


Attachments:

1. Copy of the Note
2. Copy of the Treaty

The Department of International Relations and Cooperation of the Republic of South Africa presents its compliments to the Embassy of the United States of America and has the honour to inform the Embassy regarding the request for Extradition of Mr Ricardo Paolo Spagni.

The Department of International Relations and Cooperation of the Republic of South Africa avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration.



PRETORIA
21 September 2021

The Embassy of the United States of America
PRETORIA

# EXTRADITION

**Treaty Between the**

**UNITED STATES OF AMERICA**

**and SOUTH AFRICA**

Signed at Washington September 16, 1999



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
 evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# SOUTH AFRICA

## Extradition

*Treaty signed at Washington September 16, 1999;*
*Transmitted by the President of the United States of America*
*    to the Senate May 18, 2000 (Treaty Doc. 106-24,*
*    106th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
*    September 27, 2000 (Senate Executive Report No. 106-26,*
*    106th Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
*    October 18, 2000;*
*Ratified by the President December 23, 2000;*
*Ratified by South Africa March 28, 2001;*
*Ratifications exchanged at Pretoria June 25, 2001;*
*Entered into force June 25, 2001.*

**EXTRADITION TREATY**
**BETWEEN**
**THE GOVERNMENT OF THE UNITED STATES OF AMERICA**
**AND**
**THE GOVERNMENT OF THE REPUBLIC OF SOUTH AFRICA**

# TABLE OF CONTENTS

| | |
|---|---|
| Article 1 | Obligation to Extradite |
| Article 2 | Extraditable Offences |
| Article 3 | Nationality |
| Article 4 | Political and Military Offences |
| Article 5 | Capital Punishment |
| Article 6 | Non Bis in Idem |
| Article 7 | Temporary and Deferred Surrender |
| Article 8 | Lapse of Time |
| Article 9 | Extradition Procedures and Required Documents |
| Article 10 | Admissibility of Documents |
| Article 11 | Translation |
| Article 12 | Additional Information |
| Article 13 | Provisional Arrest |
| Article 14 | Decision and Surrender |
| Article 15 | Concurrent Requests |
| Article 16 | Seizure and Surrender of Property |
| Article 17 | Rule of Specialty |
| Article 18 | Surrender to a Third State or an International Tribunal |
| Article 19 | Waiver |
| Article 20 | Transit |
| Article 21 | Representation and Expenses |
| Article 22 | Consultation |
| Article 23 | Application |
| Article 24 | Ratification, Entry into Force, and Termination |
| Annex | |

The Government of the United States of America and the Government of the Republic of South Africa;

Recalling the Treaty Relating to the Reciprocal Extradition of Criminals, signed at Washington December 18, 1947,

Noting that both the Government of the United States of America and the Government of the Republic of South Africa currently apply the terms of that Treaty, and

Desiring to provide for more effective cooperation between the two States in the fight against crime, and, for that purpose, to conclude a new treaty for the extradition of offenders;

Hereby agree as follows:

## Article 1
### Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the authorities in the Requesting State have charged with or convicted of an extraditable offence.

## Article 2
### Extraditable Offences

1. An offence shall be an extraditable offence if it is punishable under the laws in both States by deprivation of liberty for a period of at least one year or by a more severe penalty.

2. An offence shall also be an extraditable offence if it consists of attempting or conspiring to commit, or aiding, abetting, inducing, counseling or procuring the commission of, or being an accessory before or after the fact to, any offence described in sub-article 1.

3. For the purposes of this Article, an offence shall be an extraditable offence whether or not the:

 (a) laws in the Requesting and Requested States place the offence within the same category of offences or describe the offence by the same terminology; or

 (b) offence is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States Federal court.

4. If an offence has been committed outside the territory of the Requesting State, extradition shall be granted where the laws in the Requested State provide for the punishment of an offence committed outside its territory in similar circumstances. Where

the laws in the Requested State do not so provide, the executive authority of the Requested State may, in its discretion, grant extradition.

5.      Extradition shall also be granted in respect of a person convicted of but not yet sentenced, or convicted of and sentenced for an offence as contemplated in this Article, for the purpose of sentence, or for enforcing such sentence or the remaining portion thereof, as the case may be.

6.      Where extradition of a person is sought for an offence against a law relating to taxation, customs duties, exchange control, or other revenue matters, extradition may not be refused on the ground that the law of the Requested State does not impose the same kind of tax or duty or does not contain a tax, customs duty, or exchange regulation of the same kind as the law of the Requesting State.

7.      If the request for extradition relates to more than one offence and extradition is granted for an extraditable offence, it shall also be granted for any other offence specified in the request even if the latter offence is punishable by one year's deprivation of liberty or less, provided that all other requirements for extradition are met.

## Article 3
### Nationality

Extradition shall not be refused on the ground of the nationality of the person sought.

## Article 4
### Political and Military Offences

1.      Extradition shall not be granted if the offence for which extradition is requested is a political offence.

2.     For the purposes of this Treaty, the following offences shall not be considered political offences:

    (a)    a murder or other violent crime against a Head of State or Deputy Head of State of the Requesting or Requested State, or of or against a member of such person's family;

    (b)    an offence for which both the Requesting and Requested States have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their respective competent authorities for decision as to prosecution;

    (c)    murder;

    (d)    an offence involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage; and

    (e)    attempting or conspiring to commit, aiding, abetting, inducing, counseling or procuring the commission of, or being an accessory before or after the fact to such offences.

3.     Notwithstanding the terms of sub-article 2, extradition shall not be granted if the executive authority of the Requested State determines that there are substantial grounds for believing that the request has been made for the purpose of prosecuting or punishing a person on account of that person's gender, race, religion, nationality, or political opinion.

4.     The executive authority of the Requested State shall refuse extradition for offences under military law that are not offences under ordinary criminal law.

## Article 5
### Capital Punishment

1.     When the offence for which extradition is sought is punishable by death under the laws in the Requesting State, and is not punishable by death under the laws in the Requested State, the Requested State may refuse extradition unless the Requesting State provides assurances that the death penalty will not be imposed, or if imposed, will not be carried out.

2.      In instances in which a Requesting State provides an assurance in accordance with this Article, the death penalty, if imposed by the courts of the Requesting State, shall not be carried out.

### Article 6
### Non Bis in Idem

1.      Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State of the offence for which extradition is requested.

2.      Extradition shall not be precluded by the fact that the competent authorities of the Requested State have decided either:

(a)     not to prosecute the person sought for the acts or omissions for which extradition is requested;

(b)     to discontinue any criminal proceedings which have been instituted against the person sought for those acts or omissions, provided that such discontinuance does not have the effect of acquittal: or

(c)     to investigate the person sought for the same acts or omissions.

### Article 7
### Temporary and Deferred Surrender

1.      The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State until such prosecution has been concluded or any such sentence has been served.

2.      If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the Requested State, that State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that

person, in accordance with conditions to be determined by mutual agreement between the Requesting and Requested States.

## Article 8

### Lapse of Time

Extradition shall not be granted when the prosecution has become barred by lapse of time according to the laws in the Requesting State.

## Article 9

### Extradition Procedures and Required Documents

1. All requests for extradition shall be made in writing and shall be submitted through the diplomatic channel.

2. All requests shall be supported by:

    (a)    information describing the facts of the offence(s) and the procedural history of the case;

    (b)    a statement or text of the law, if any, creating or relating to the offence(s) for which the extradition is requested;

    (c)    a statement or text of the relevant law prescribing maximum punishment for the offence(s);

    (d)    a statement or text of the law relating to lapse of time which shall be conclusive;

    (e)    as accurate a description as possible of the person sought together with any other information which may help to establish that person's identity or nationality and probable location; and

    (f)    the documents, statements, or other information specified in sub-article 3 or 4, as the case may be.

3.    In addition to the information, statements or documents referred to in sub-article 2, a request for extradition of a person who is sought for prosecution shall also be supported by:

    (a)    a copy of the warrant or order of arrest, if any, issued by a judge or other competent authority;

    (b)    a copy of the indictment, charge sheet, or other charging document; and

    (c)    such information as would justify committal for extradition under the laws of the Requested State, but neither State is required to establish a prima facie case.

4.    In addition to the information, statements or documents referred to in sub-article 2, a request relating to a person who has been convicted of the offence for which extradition is sought shall also be supported by:

    (a)    a copy of the judgment of conviction, or, if a copy is not available, a statement by a judicial officer or other competent authority that the person has been convicted or a copy of any record of conviction that reflects the charge and the conviction;

    (b)    information establishing that the person sought is the person to whom the finding of guilt refers;

    (c)    a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

    (d)    in the case of a person who has been convicted in absentia, the documents required by sub-article 3.

### Article 10
### Admissibility of Documents

Any document referred to in Article 9 shall be received in evidence in any proceedings for extradition if:

1. In the case of a request from the United States, such document is:

    (a) accompanied by a certificate according to the example set out in the Annex to this Treaty; or

    (b) authenticated by the signature and seal of office of:

        (i) the head of a South African diplomatic or consular mission or a person in the administrative or professional division of the public service serving at a South African diplomatic, consular, or trade office in the United States of America or a South African foreign service officer grade VII or an honorary South African consul general, vice-consul or trade commissioner; or

        (ii) any government authority of the United States of America charged with the authentication of documents in terms of its domestic law; or

        (iii) any notary public or other person in the United States of America who shall be shown by a certificate of any person referred to in subparagraphs (i) or (ii) or of any diplomatic or consular officer of the United States of America in the Republic of South Africa to be duly authorized to authenticate such document in terms of the domestic law of the United States of America

2. In the case of a request from the Republic of South Africa, such document is certified by the principal diplomatic or principal consular officer of the United States resident in the Republic of South Africa, as provided by the extradition laws of the United States; or

3. Such document is certified or authenticated in any other manner acceptable by the laws in the Requested State.

### Article 11
### Translation

Any document produced in relation to extradition proceedings in terms of this Treaty which is not in English shall be accompanied by a translation in English.

### Article 12
### Additional Information

1.      If the executive authority of the Requested State considers that the information furnished in support of the request for extradition is not sufficient to enable the request for extradition to be granted, it shall notify the Requesting State in order to enable that State to furnish additional information.

2.      The executive authority may fix a reasonable time limit for such information to be furnished.

3.      Nothing shall prevent the executive authority of the Requested State from presenting to a court of that State information sought or obtained after submission of the request to the Court or after expiration of the time stipulated pursuant to sub-article 2.

### Article 13
### Provisional Arrest

1.      In case of urgency, the Requesting State may, for the purpose of extradition, request the provisional arrest of the person sought pending presentation of the documents in support of the extradition request.  A request for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Republic of South Africa Department of Justice.  The facilities of the International Criminal Police Organization (INTERPOL) also may be used to transmit such a request. The application may also be transmitted by post, telegraph, telefax, or any other means affording a record in writing.

2. The application for provisional arrest shall contain:

    (a)    a description of the person sought;

    (b)    the location of the person sought, if known;

    (c)    a description of the offence(s);

    (d)    a concise statement of the acts or omissions alleged to constitute the offence(s);

    (e)    a description of the punishment that can be imposed or has been imposed for the offence(s);

    (f)    a statement that a document referred to in Article 9(3)(a) or Article 9(4)(a), as the case may be, exists; and

    (g)    a statement that the documents supporting the extradition request for the person sought will follow within the time specified in this Treaty.

3. Prompt attention shall be given to such application and the Requesting State shall be notified as soon as possible of the decision regarding its application for provisional arrest and, if applicable, the reasons for any inability to proceed with the application.

4. A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the documents required in Article 9. For this purpose, receipt of said documents by the Embassy of the Requested State in the Requesting State shall constitute receipt by the executive authority of the Requested State.

5. The release from custody of a person pursuant to sub-article 4 shall not prejudice the subsequent re-arrest and extradition of that person if the documents required in Article 9 are delivered at a later date.

## Article 14
### Decision and Surrender

1.      The Requested State shall promptly notify the Requesting State of its decision on the request for extradition.

2.      Reasons shall be given by the Requested State for any complete or partial refusal of a request for extradition.  The Requested State shall provide copies of pertinent judicial decisions upon request.

3.      If the request for extradition is granted, the relevant authorities of the Requesting and Requested States shall agree on the date and place for the surrender of the person sought.

4.      If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, that person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offence.

5.      If circumstances beyond its control prevent either the Requesting State or the Requested State from respectively surrendering or receiving the person sought, the State so prevented shall notify the other accordingly and seek to agree on a new date for such surrender.

## Article 15
### Concurrent Requests

1.      Where requests are received from two or more States for the extradition of the same person, either for the same offence or for different offences, the executive authority of the Requested State shall determine to which of those States, if any, the person is to be extradited and shall notify the Requesting State of its decision.

2.     In determining to which State the person is to be extradited, the Requested State shall consider all relevant factors, including but not limited to:

    (a)     whether the requests were made pursuant to an extradition treaty;

    (b)     the relative seriousness of the offences, should those requests relate to different offences;

    (c)     the time and place of commission of each offence;

    (d)     the respective dates on which the requests were received from the respective States;

    (e)     the interests of the respective States;

    (f)     the nationality of the victim; and

    (g)     the possibility of any subsequent extradition between the respective States.

### Article 16
### Seizure and Surrender of Property

1.     To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all property, including articles and documents, that may be found in the Requested State and that has been acquired as a result of the offence or is connected thereto or may be required as evidence, if extradition is granted.

2.     The property referred to in sub-article 1 may be surrendered to the Requesting State, if the latter so requests, even if the extradition cannot be carried out due to the death, disappearance, or escape of the person sought.

3.     Where the said property is liable to seizure or confiscation within the jurisdiction of the Requested State, the latter may, upon satisfactory assurances from the Requesting State that the property will be returned within a fixed period of time or as soon as practicable, temporarily surrender that property to the Requesting State. The Requested State may also defer the surrender of such property if it is required in connection with pending criminal proceedings in the jurisdiction of the Requested State.

4.     Any rights which the Requested State or third parties may have to such property shall be duly respected in accordance with the law in the Requested State.

## Article 17
## Rule of Specialty

1.     A person extradited under this Treaty shall not be detained, tried, or punished in the Requesting State for any offence committed before his or her extradition other than an offence:

    (a)     for which extradition was granted or any other extraditable offence of which the person could be convicted upon proof of the facts upon which the request for extradition was granted, or is a lesser included offence;

    (b)     for which the executive authority of the Requested State consents to the person's detention, trial, or punishment.  For the purpose of this paragraph:

        (i)     the Requested State may require the submission of the documentation referred to in Article 9; and

        (ii)     the person extradited may be detained by the Requesting State for sixty (60) days, or for such longer period of time as the Requested State may authorize, pending the processing of the request.

2.     Sub-article 1 of this Article shall not apply if:

    (a)     the person extradited leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

    (b)     the person extradited has had an opportunity to leave the territory of the Requesting  State and has not done so within fifteen (15) days of final discharge in respect of the offence for which that person was extradited.

## Article 18

### Surrender to a Third State or an International Tribunal

1.      Where a person has been surrendered to the Requesting State by the Requested State, the Requesting State shall not surrender that person to any third State or an international tribunal for an offence committed before that person's surrender unless:

    (a)     the Requested State consents to that surrender; or

    (b)     the person has had an opportunity to leave the territory of the Requesting State and has not done so within fifteen (15) days of final discharge in respect of the offence for which that person was surrendered by the Requested State or has returned to the territory of the Requesting State after leaving it.

2.      Before acceding to a request pursuant to sub-article 1, the Requested State may request relevant information.

## Article 19

### Waiver

If the person sought consents to be surrendered to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

## Article 20

### Transit

1.      Either State may authorize transportation through its territory of a person surrendered to the other State by a third State.

2.      A request for transit shall be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Department of Justice of

the Republic of South Africa. In cases of urgency, the facilities of the International Criminal Police Organization (INTERPOL) may also be used to transmit such a request.

3.      The request for transit shall contain:

     (a)    a description of the person together with any information that may help to establish his or her identity and nationality; and

     (b)    a brief statement of the facts of the case, and a list of the offences for which the person was surrendered by the third State.

4.      Permission for the transit of a person shall, subject to the law of the Requested State, include permission for the person to be held in custody during transit. If transportation is not continued within a reasonable time, the executive authority of the State in whose territory the person is being held may direct that the person be released.

5.      Authorization is not required when air transportation is used by one State and no landing is scheduled on the territory of the other State. If an unscheduled landing does occur, the State in whose territory such landing occurs may require a request for transit pursuant to sub-article 2, and it may detain the person until the request for transit is received and the transit is effected, provided that such request is received within 96 hours of the unscheduled landing.

## Article 21
### Representation and Expenses

1.      The Requested State shall make all necessary arrangements for and meet the cost of any proceedings arising out of a request for extradition and shall advise, assist, appear in court on behalf of, and otherwise represent the interests of the Requesting State.

2.      The Requested State shall bear the expenses incurred in its territory or jurisdiction in the arrest and detention of the person whose extradition is sought until that person is surrendered to a person nominated by the Requesting State.

3. The Requesting State shall pay all the expenses incurred in the translation of extradition documents and in conveying the person from the territory of the Requested State.

4. Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons under this Treaty.

## Article 22
## Consultation

The United States Department of Justice and the Department of Justice of the Republic of South Africa or persons designated by the respective Departments of Justice may consult with each other directly or through the facilities of the International Criminal Police Organization (INTERPOL) in connection with the processing of individual cases and in furtherance of efficient implementation of this Treaty.

## Article 23
## Application

This Treaty shall apply to any offence contemplated in Article 2, whether committed before, on, or after the date upon which this Treaty enters into force. Nothing in this treaty shall be deemed to require or authorize any action by the Requested State that is contrary to the constitution of that State.

## Article 24
## Ratification, Entry into Force, and Termination

1. This Treaty shall be subject to ratification, and the instruments of ratification shall be exchanged as soon as possible.

2.      This Treaty shall enter into force upon the exchange of the instruments of ratification.

3.      Upon the entry into force of this Treaty, the Treaty Relating to the Reciprocal Extradition of Criminals, signed at Washington December 18, 1947, shall cease to have any effect.  Nevertheless, the prior Treaty shall apply to any extradition proceedings in which the extradition documents have already been submitted to the courts of the Requested State at the time this Treaty enters into force, except that Article 19 of this Treaty shall be applicable to such proceedings.  Articles 17 and 18 of this Treaty shall apply to persons found extraditable under the prior Treaty.

4.      Either State may terminate this Treaty at any time by giving written notice to the other State, and the termination shall be effective six months after the date of such notice.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE at Washington in duplicate, this sixteenth day of  September, 1999.

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF
THE REPUBLIC OF SOUTH AFRICA:

**ANNEX**

**APPOSTILLE**

**(Convention de la Haye du 5 Octobre 1961)**

1. Country ................................................................................
   This public document
2. has been signed by ..................................................................
3. acting in the capacity of ...........................................................
4. bears the seal/stamp of .............................................................

**Certified**

5. at ....................................................................................
6. the (date) ...........................................................................
7. by ....................................................................................
8. No. ...................................................................................
9. Seal/stamp:                          10. Signature:
   ..........................................    ..........................................
   ..........................................    ..........................................
   ..........................................    ..........................................



U.S. Department of State

## CERTIFICATE TO BE ATTACHED TO DOCUMENTARY
## EVIDENCE ACCOMPANYING REQUISITIONS IN
## THE UNITED STATES FOR EXTRADITION
## AMERICAN FOREIGN SERVICE

Johannesburg      09-23-2021
_____
Place and Date *(mm-dd-yyyy)*

I, John Gimbel , Country Consular Coordinator
_____ _____
Name      Title

the United States of America at    US Consulate General Johannesburg South Africa

certify that the annexed papers, being    Supporting Documents

ed to be used upon an application for the extradition from the United States of America

Paolo Spagni ,

with the crime of    Fraud

have been committed in    South Africa

and legally authenticated so as to entitle them to be received in evidence for similar purposes by

the courts of    South Africa ,

as required Title 18, United States Code, Section 3190.

witness whereof I hereunto sign my name and cause my seal of office to be affixed

_____ day of    September 2021
               Month and Year

_____
Signature

John Gimbel - Country Consular Coordinator
_____
Type Name and Title of Certifying Officer
of the United States of America.

DS-0036
08-2019

DEPARTEMENT VAN
JUSTISIE EN STAATKUNDIGE
ONTWIKKELING



DEPARTMENT OF JUSTICE
AND CONSTITUTIONAL
DEVELOPMENT

REPUBLIEK VAN SUID-AFRIKA

REPUBLIC OF SOUTH AFRICA

# APOSTILLE

(Convention de La Haye du 5 octobre 1961)

1. Country     **THE REPUBLIC OF SOUTH AFRICA**

The public document marked "X"

2. has been signed by     **ADVOCATE NICOLETTE ASTRAID BELL**

3. in the capacity of     **ACTING DIRECTOR OF PUBLIC PROSECUTIONS, WESTERN CAPE HIGH COURT DIVISION.**

4. bears the seal/stamp of     **THE DIRECTOR OF PUBLIC PROSECUTIONS, CAPE TOWN**

**CERTIFIED**

5. by     **MR EDGAR RICHARD BOTES, ACTING PRINCIPAL STATE LAW ADVISOR, DEPARTMENT OF JUSTICE AND CONSTITUTIONAL DEVELOPMENT, REPUBLIC OF SOUTH AFRICA**

6. at **PRETORIA**     7. The **13**TH DAY of SEPTEMBER 2021

8. Seal/Stamp

DEPARTMENT OF JUSTICE

2021 -09- 1 3

PRETORIA
CHIEF DIRECTORATE
ERNATIONAL LEGAL RELATIONS

9. ................................. E. R. BOTES ................

**SIGNATURE**



TO THE CENTRAL AUTHORITY FOR EXTRADITION AND MUTUAL LEGAL
ASSISTANCE IN THE UNITED STATES OF AMERICA

IN THE MATTER BETWEEN

*THE REPUBLIC OF SOUTH AFRICA*

*and*

*RICARDO PAOLO SPAGNI*

---

*APPLICATION FOR EXTRADITION BY THE CENTRAL AUTHORITY FOR THE
REPUBLIC OF SOUTH AFRICA*

---

## I N D E X

| Documents | | Page |
|---|---|---|
| 1. | Covering sheet | 1 |
| 2. | Index to contents | 2 |
| 3. | Filing sheet | 4 |
| 4. | Advocate Nicolette Astraid Bell: Founding Affidavit | 5–17 |
| 5. | ANNEXURE "A" Charge sheet | 18-42 |
| 6. | ANNEXURE "B" Supporting Affidavit: Detective Sergeant Steven Pritchard | 43-59 |
| 7. | ANNEXURE "B1" Affidavit in support of the warrant of arrest- RICARDO PAOLO SPAGNI | 60-61 |
| 8. | ANNEXURE "B2" warrant of arrest- RICARDO PAOLO SPAGNI | 62 |
| 9. | ANNEXURE "C" Extract – Fraud | 63-64 |
| 10. | ANNEXURE "D" Extract – Forgery | 65-67 |
| 11. | ANNEXURE "E" Extract – Uttering | 68-69 |
| 12. | ANNEXURE "F" Extract – The offence of contravening section 59(1)(h) of the *Value-Added Tax Act, No. 89 of 1991* | 70-71 |

2



13.  ANNEXURE "G" Legislation: *Section 276 of the Criminal Procedure Act, No. 51 of 1977*  72-73

14.  ANNEXURE "H" Extract - *Section 18 of the Criminal Procedure Act, No. 51 of 1977*  74

3

**IN THE EXTRADITION APPLICATION BY THE REPUBLIC OF SOUTH AFRICA**

IN THE MATTER BETWEEN:

**THE REPUBLIC OF SOUTH AFRICA**

and

**RICARDO PAOLO SPAGNI**

---

**FILING SHEET**

---

The Application for Extradition is presented for action to the Honourable, the Director General of the Department of Justice and Constitutional Development of the Republic of South Africa, the Central Authority for Extradition and International Mutual Legal Assistance, Presidia Building, Pretorius Street, Pretoria by Adv Nicolette Astraid Bell, the Acting Director of Public Prosecutions for the Western Cape High Court Division of the High Court of South Africa and a Acting Director of Public Prosecutions in the National Prosecuting Authority of the Republic of South Africa.



**ADV NICOLETTE ASTRAID BELL**

Acting Director of Public Prosecutions, Western Cape

High Court of South Africa (Western Cape High Court Division)

115 Buitengracht

Cape Town

Republic of South Africa

(Telephone number: +27 21 4877226)

4

**IN THE APPLICATION FOR EXTRADITION OF**

**RICARDO PAOLO SPAGNI**

**FROM THE UNITED STATES OF AMERICA TO THE REPUBLIC OF SOUTH AFRICA**

---

**FOUNDING AFFIDAVIT**

---

I, the undersigned,

**NICOLETTE ASTRAID BELL**

do hereby present my compliments to the Central Authority for Extradition and International Mutual Legal Assistance in the United States of America and declare under oath that:

## A.     INTRODUCTION

1.      I am an Advocate of the High Court of the Republic of South Africa (South Africa) in the National Prosecuting Authority of South Africa and duly appointed to act under the provisions of section 13 read with section 1 of the *National Prosecuting Authority Act, No. 32 of 1998* of the Republic ("*NPA Act*"), with chambers in the National Prosecuting Authority Building at 115 Buitengracht Street, Cape Town, Republic of South Africa. I am the Acting Director of Public Prosecutions for the Western Cape Provincial Division of the High Court of South Africa.

2.      As the Acting Director of Public Prosecutions for the Western Cape Provincial Division of the High Court of South Africa, I am responsible for all prosecutions within said area of jurisdiction. I am duly authorized to bring this application.

5

3.    I am fully acquainted with the facts, as well as the investigative and prosecutorial aspects relating to the case against Ricardo Paolo Spagni ("Spagni").

4.    The National Prosecuting Authority of the Republic of South Africa ("NPA") is responsible for all criminal prosecutions in South Africa. The National Director of Public Prosecutions for the Republic is head of the NPA. The final authority over the NPA lies with the Minister of Justice and Constitutional Development.

5.    As an Acting Director of Public Prosecutions, I am professionally competent to advise on the law relating to:

5.1.    the offences with which the NPA seeks to secure the extradition and prosecution of Spagni,

5.2.    the law relating to the sentences for the offences in question,

5.3.    the law relating to prescription,

5.4    the relevant facts that will be relied upon to continue the prosecution against the person sought to be extradited, to wit, Spagni,

5.5    to assist the Republic in extradition matters that emanate from my area of jurisdiction,

5.6    on the South African law relating to the constitutional/legal protections afforded to both accused persons and detainees.

6



**B.** **STATEMENT OF THE OFFENCES FOR WHICH THE EXTRADITION OF SPAGNI IS SOUGHT**

Spagni has been charged in the Regional Court of the Western Cape Division sitting at Cape Town with the following offences:

| | |
|---|---|
| **Counts 1-17** | *Fraud alternatively contraventions of section 59(1)(h) of the Valued Added Tax Act, No.89 of 1991* |
| **Counts 18-34** | *Forgery* |
| **Counts 35-51** | *Uttering* |
| **Counts 52-121** | *Fraud alternatively contraventions of section 59(1)(h) of the Valued Added Tax Act, No.89 of 1991* |
| **Counts 122-191** | *Forgery* |
| **Counts 192-261** | *Uttering* |
| **Counts 262-283** | *Fraud alternatively contraventions of section 59(1)(h) of the Valued Added Tax Act, No.89 of 1991* |
| **Counts 284-305** | *Forgery* |
| **Counts 306-327** | *Uttering* |
| **Counts 328-344** | *Fraud alternatively contraventions of section 59(1)(h) of the Valued Added Tax Act, No.89 of 1991* |
| **Counts 345-361** | *Forgery* |
| **Counts 362-378** | *Uttering* |

The charge sheet is attached hereto as **ANNEXURE "A"**

**C.** **INVESTIGATION AND LEGAL PROCEEDINGS LEADING TO AND JUSTIFYING THE REQUEST FOR EXTRADITION**

1. The criminal offences as specified in the charge sheet (**ANNEXURE "A"**) were investigated by the Detective Branch of the South African Police Service (SAPS)

7



in Maitland within the Western Cape, South Africa. The investigating officer is Detective Sergeant Steven Pritchard ("Pritchard").

2. The events which gave rise to the offences and which led to this request, are described in the supporting affidavit of Pritchard (which is attached as **ANNEXURE "B"**). In his affidavit, Pritchard sets out the facts upon which the charges are based and provides a summary of the evidence supporting the facts.

3. At the time that Spagni fled South Africa in the first part of 2021 criminal proceedings had already commenced against him the Cape Town Regional Court. He pleaded not guilty to the all charges in the charge sheet (**ANNEXURE "A"**) on 22 August 2019. The testimony of two witnesses had already been heard when the continuation of the proceedings was interrupted by the inception of the COVID 19 pandemic and Spagni's claims that his medical condition prevented him from travelling to and attending his further trial. It was only when less invasive means had failed that a warrant of arrest was obtained in order to secure his attendance at court. Pritchard's affidavit in support of the warrant arrest is attached as **ANNEXURE "B1"**. The warrant of arrest is attached as **ANNEXURE "B2".** This is described in more detail in Pritchard's affidavit. Under South African law, the warrant allows Spagni to be arrested and prosecuted on all of the offences in the charge sheet (**ANNEXURE "A"**) and which underlie this extradition request.

4. I have been advised that Spagni was arrested in Nashville, Tennessee on 21 July 2021 as a result of a request for provisional arrest in terms of Article 13 of the *Extradition Treaty between the Republic of South Africa and the United States of America* facilitated by Interpol and the US Authorities.

8



**D. IDENTIFICATION OF THE PERSON WHOSE EXTRADITION ARE REQUESTED**

1. Spagni is an adult male South African citizen with South African ID number: ████████████ A copy of a photograph taken of Spagni forms part of the warrant attached as **ANNEXURE "B2".**

**E. THE BASIS RELIED ON FOR THE APPLICATION FOR EXTRADITION**

1. Both South Africa and the United States of America are parties to the *Extradition Treaty (Treaty) between the Republic of South Africa and the United States of America* which was entered into on 16 September 1999 and of which the instruments of ratification to bring the *Treaty* into force took place on 25 June 2001.

2. This is a formal request for extradition as per the requirements of Article 9 of the *Treaty*.

3. In the event, Spagni is to be further tried by a competent court within my area of jurisdiction in the Republic of South Africa on the charges set out in **ANNEXURE "A".**

**F. STATEMENT OF THE ACTS AND OMISSIONS CONSTITUTING THE OFFENCES**

The acts which constitute the offences mentioned in **ANNEXURE "A"** are set out in the supporting affidavit of Pritchard **(ANNEXURE "B").**

9

## G. NATURE OF THE EVIDENTIAL MATERIAL

The evidential material available in this matter consists primarily of the statements of witnesses, whose evidence will be corroborated by bank statements, implicating Spagni as beneficiary of R1 453 561.47 transferred from the bank account of the complainant (Cape Cookies) into the bank accounts of Spagni. This is dealt with in detail in Pritchard's affidavit (**ANNEXURE "B"**). There was and is sufficient evidence to successfully prosecute Spagni for offences for which he has been charged and is being tried.

## H. SOUTH AFRICAN LAW PERTAINING TO OFFENCES

1. Fraud, forgery and uttering as per the charge sheet are common law offences. South African Criminal Law is not completely codified as is the case in many other countries. Offences such as fraud, forgery and uttering exist in terms of the South African common law.

2. The law applicable to fraud as well as other common law crimes is sourced in the South African common law, which is reflected in a number of text books and articles written by leading authorities on Criminal Law in South Africa. LAWSA provides an authoritative statement of the law in this regard.

3. The offence of contravening section 59(1)(h) of the *Valued-Added Tax Act, No.89 of 1991(VAT Act)* is a statutory offence.

## H1. FRAUD

1. The crime of fraud in South African law is defined as:

10

*"…unlawfully making, with intent to defraud, a misrepresentation which causes actual prejudice or which is potentially prejudicial to another".*

1.  The essential elements of the crime of fraud are misrepresentation, prejudice (potential or actual), unlawfulness and intention to defraud.

2.  I attach hereto as **ANNEXURE "C",** an explanation of the common law crime of fraud as is set out in *LAWSA VOLUME 6 CRIMES AGAINST THE PERSON-FRAUD* at paragraph **306**.

## H 2   FORGERY

1.  Forgery consists of the unlawfully and intentionally making of a false document to the actual or potential prejudice of another.

2.  I attach hereto as **ANNEXURE "D",** an explanation of the common law crime of forgery as is set out in *LAWSA VOLUME 6 CRIMES AGAINST THE PERSON-FORGERY* at paragraph **317**.

## H3   UTTERING

1.  Uttering consists of the unlawfully and intentionally passing off a false document (forged) to the actual or potential prejudice of another.

2.  I attach hereto as **ANNEXURE "E",** an explanation of the common law crime of uttering as is set out in *LAWSA VOLUME 6 CRIMES AGAINST THE PERSON-UTTERING* in paragraph **378**.

11



**H4** **CONTRAVENING SECTION 59(1)(h) OF THE VALUE ADDED TAX ACT, No. 89 OF 1991**

1. The preamble to the *VAT Act* sets out the purpose of the legislation:

   *"To provide for taxation in respect of the supply of goods and services and the importation of goods; to amend the Transfer Duty Act, 1949, so as to provide for an exemption; to amend the Stamp Duties Act, 1968, so as to provide for an exemption from stamp duty and to discontinue the levying of certain stamp duties; to repeal the Sales Tax Act, 1978; and to provide for matters connected therewith."*

2. I attach hereto as **ANNEXURE "G",** an extract from the *VAT Act* of the relevant offence and penalty provisions contained in section 59 of the *Act.*

**I. PENALTIES**

1. The offences on which Spagni is sought to be charged are extraditable offences and are punishable by imprisonment for a minimum period of at least one year or by a more severe penalty.

2. In general penalties are provided for in section 276 of the *Criminal Procedure Act, No. 51 of 1977* ("the *CPA*") **(ANNEXURE "H").** In terms of section 276 the following sentences may be imposed:

   a. Imprisonment, including imprisonment for a period of fifteen to twenty years;
   b. periodical imprisonment;
   c. declaration as habitual criminal;

12

d. committal to any institution established by law;

e. a fine;

f. correctional supervision;

g. imprisonment from which such a person may be placed under correctional supervision in the discretion of the Commissioner or a parole board.

3. Offences relating to fraud, forgery and uttering are regarded as very serious offences in South African law, particularly where the accused is in a position of trust, and are punishable within the punitive jurisdiction of a court.

4. The period of imprisonment on conviction is at the discretion of the court and limited only as to the maximum period prescribed by the relevant legislation.

5. The nature of the punishment imposed by the court is discretionary. Where the minimum sentences are prescribed, the court still has a discretion to depart from the minimum sentence if there are substantial and compelling grounds to do so.

6. The exact nature of the punishment in each case will be determined by the facts and circumstances of the case, the personal circumstances of the accused person and the interest of society.

7. In the event of extradition, Spagni will be further prosecuted in the Regional Court in Cape Town. If convicted, the NPA will seek long-term imprisonment.

8. Precedents governing sentences in South Africa for the type of offences allegedly committed by Spagni, reflect substantial periods of imprisonment.

9. The maximum penalty for a contravention of section 59(1)(h) of the *Vat Act* is 60 months imprisonment per contravention (see **ANNEURE "G"**)

13

## J.   THE LAW OF SPECIALITY

The Law of Speciality as applied in South Africa is that a requested person may only be tried in the Requesting State for those offences for which he is successfully sought from the Requested State. In other words, the requested person may only be tried in respect of those offences in respect of which his extradition is granted.

## K.   PRESCRIPTION

1.   In terms of section 18 of the *CPA*, the right to institute a prosecution in South Africa in respect of offences for which extradition is sought excluding the crime murder prescribes after a period of 20 years from the date of the commission thereof. The crime of murder has no period of prescription.

Section 18 is attached as per **ANNEXURE "I"**.

2.   Prescription is not applicable as the offences were all allegedly committed between 30 November 2009 and 11 May 2011, and Spagni therefore does not benefit from an amnesty or statute of limitation.

## L.   RECIPROCITY AND OTHER RELEVANT CONSIDERATIONS

1.   The South African offences of fraud, forgery and uttering are similarly constituted as criminal offences under Chapter 47 of the United States of America's Criminal Code.

2.   The offences are not of a political, military nature or are crimes of thought.

14

3. This application is not being made for purposes of prosecuting Spagni on account of their race, religion, nationality or political opinion or to prejudice them for any of these reasons.

4. The Republic of South Africa will honour its obligation to pay expenses associated with this request for extradition.

5. The Republic of South Africa respects the principle of reciprocity and undertakes to honour any similar future request from the Central Authority of the United States of America.

## M. LANGUAGE

The request has been compiled in the English language.

## N. CONTACT PERSONS

**Responsible Officials:**

1. Lead Prosecutor

| | |
|---|---|
| Name: | Adv T Berry (DPP, STU Cape Town) |
| Tel: | (+27) 21 4877225 |
| Mobile: | (+27) 84 8747058 |
| E-mail: | tberry@npa.gov.za |

2. Investigating Officer

15

| Name: | D/Sgt S Pritchard |
|---|---|
| Tel: | (+27) 21 5069400 |
| Mobile: | (+27) 83 7417983 |
| E-mail: | MAITLAND-CID@saps.gov.za |

## O.    CONCLUSION

1.    None of the offences set out in paragraph **B** *supra* and detailed by Pritchard in his supporting affidavit are such as to raise an extradition objection in the United States of America.

2.    As a consequence of the above and on behalf of the Republic of South Africa, I respectfully request the extradition of Spagni to the Republic of South Africa in accordance with the provisions and the relevant procedure provided by the law of the United States of America.

3.    Should it become necessary or be deemed appropriate, I would respectfully reserve the right to provide further evidence in support of this application.

I know and understand the content of this declaration.

I have no objection to taking the prescribed oath.

I consider the prescribed oath to be binding on my conscience.

SIGNED AT CAPE TOWN ON THIS 27th DAY OF AUGUST 2021

16

NICOLETTE ASTRAID BELL

ACTING DIRECTOR OF PUBLIC PROSECUTIONS: WESTERN CAPE

I certify that the above statement was taken by me and that the deponent has acknowledged that he knows and understands the content of this statement.

This statement was sworn to before me and the deponent's signature was placed thereon in my presence at **CAPE TOWN** on this 27th day of August 2021.

........................................................

(MS) J PIENAAR

EX-OFFICIO COMMISSIONER OF OATHS

CHIEF CLERK

DIRECTOR OF PUBLIC PROSECUTIONS: WESTERN CAPE

115 BUITENGRACHT

CAPE TOWN

8000



DIREKTEUR VAN OPENBARE VERVOLGING
KAAPSTAD
2 7 AUG 2021
CAPE TOWN
DIRECTOR OF PUBLIC PROSECUTIONS

17



**IN THE REGIONAL DIVISION OF THE CAPE
HELD AT CAPE TOWN**

**CASE NUMBER F93/2017**

In the matter between:

**THE STATE**

Versus

**RICARDO SPAGNI**
**(Hereinafter referred to as "the accused")**

---

### CHARGE SHEET

---

**PREAMBLE:**

**WHEREAS**

1. THE ACCUSED

   1.1. Is a 36 year old, South African citizen, with identification number ▮▮▮▮▮▮▮▮ residing at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   1.2. Was employed by Cape Cookies CC ("Cape Cookies") for the period 1 October 2009 to 8 June 2011 as Information Technology Manager (IT Manager);

   1.3. Held a bank account with ABSA bank with account number ▮▮▮ 5442 into which Cape Cookies paid his monthly salary;

   1.4. Held four further savings accounts with ABSA bank with the following account numbers ▮▮▮ 7260, ▮▮▮ 2919, ▮▮▮ 3591 and ▮▮▮ 4866;

   1.5. Cape Cookies principal place of business is situated at 16 Chapel Street Maitland, in the Regional Division of the Cape;

   1.6. Cape Cookie's postal address is PO Box 810 Maitland 7404;



1.7. The postal address of PO Box 2939 Somerset West 7130 is unknown to the management of Cape Cookies;

1.8. As IT Manager the accused was required to comply with the financial policy of the company that included signing off on invoices for goods and services supplied to his department and authorising payment of these invoices for his department up to R2000;

1.9. In circumstances where invoices exceeded R2000 the invoices were presented to the Chief Financial Officer (Leslie Slye) for authorisation whereafter these invoices would be loaded for payment by the assistant accountant (Claudette Farmer) onto the FNB bank's Electronic Fund Transfer payment system;

1.10. All invoices were paid from the Cape Cookies FNB bank account with account number ▮▮▮6966;

2. EOH Mthombo (Pty) Ltd trading as Ensync Network Solutions (Pty) Ltd

2.1. Ensync Network Solutions (Pty) Ltd (Ensync) provided information technology services and goods to Cape Cookies;

2.2. Ensync underwent a change of ownership during November 2010 and formally started trading as EOH Mthombo (Pty) Ltd from March 2011;

2.3. EOH Mthombo (Pty)Ltd t/a Ensync is registered for VAT with SARS with VAT number 4320172499;

2.4. Ensync's invoices were paid by Cape Cookies into ABSA account number ▮▮▮7260 held by the accused Mr RP Spagni;



2.5. Ensync has a bank account with Nedbank with account number ███2360 and does not have a bank account with ABSA;

3. DarkCube Biometrics CC

3.1. DarkCube Biometrics CC was associated with a deregistered entity called Dust Technologies CC and Cape Cookies never had any business dealings with either of the entities;

3.2. The contact details and VAT registration number of DarkCube reflected on the invoices presented to Cape Cookies are invalid;

3.3. DarkCube Biometrics CC could not be traced and Cape Cookies did not receive any invoices or enquiry pertaining to outstanding monies from the entity since the accused left the employment of Cape Cookies;

3.4. DarkCube's invoices were paid by Cape Cookies into <u>ABSA account with account number</u> ███2919 <u>held by the accused Mr RP Spagni;</u>

4. Jurun Trading CC t/a SolidSource

4.1. Jurun Trading CC t/a SolidSource is not registered with CIPRO under the registration number CK2000/081731/23;

4.2. The VAT number 4328441084 reflected on the invoices issued to Cape Cookies is not recognised as a valid VAT number by SARS;

4.3. Jurun Trading CC t/a SolidSource could not be traced and Cape Cookies did not receive any invoices or enquiry pertaining to outstanding monies from the entity since the accused left the employment of Cape Cookies;

4.4. SolidSource's invoices were paid by Cape Cookies into <u>ABSA account with account number</u> ███3591 <u>held by the accused Mr RP Spagni;</u>



5. StorVault Africa

   5.1. The VAT number 4377981235 quoted on the invoices issued to Cape Cookies by StorVault Africa is not recognised as a valid VAT number by SARS;

   5.2. StorVault Africa could not be traced and Cape Cookies did not receive any invoices or enquiry pertaining to outstanding monies from the entity since the accused left the employment of Cape Cookies;

   5.3. Cape Cookies paid the StorVault Africa invoices into an <u>ABSA account with account number</u> ▆▆▆▆ <u>4866 held by the accused Mr RP Spagni.</u>

**NOW THEREFORE** the accused is guilty of the following offences:

<u>**COUNTS 1 to 17**</u>

**FRAUD**

**(Ensync Network Solutions (PTY)Ltd – Schedule 1)**

**IN THAT** on or about the dates as mentioned in Column A of Schedule 1, and at or near the business premises of Cape Cookies CC situated at 16 Chapel Street Maitland, in the Regional Division of the Western Cape, the accused unlawfully, falsely and with the intent to defraud, gave out and pretended to Cape Cookies and/or the Chief Financial Officer of Cape Cookies, Leslie Slye and/or other representatives of Cape Cookies, that:

   1. The invoices mentioned in Column B of Schedule 1 have been issued by Ensync Network Solutions (Pty) Ltd for actual services rendered and/or goods delivered by Ensync Network Solutions (Pty) Ltd to Cape Cookies and/or

   2. The invoices were authorised or ought to be authorised for full and final settlement for the amounts set out in Column D of Schedule 1 in relation to the services and/or goods that were in actual fact rendered to the IT department of Cape Cookies by Ensync Network Solutions (Pty) Ltd and/or



3. The accused was authorised and/or entitled to present for authorisation the said invoices that would result in payment inclusive of VAT by Cape Cookies to Ensync Network Solutions (Pty) Ltd in the amounts as per Column D of Schedule 1 and/or

4. Payment should be made from the business bank account of Cape Cookies to Ensync Network Solutions (Pty) Ltd bank account as per Column F of Schedule 1 and/or

5. Ensync Network Solutions (Pty) Ltd is registered for VAT with SARS with VAT registration number 4470205206 as stipulated on the invoices per Column B of Schedule 1 being valid tax invoices, and/or

6. The VAT portion of the said invoice as per Column E of Schedule 1 is payable to Ensync Network Solutions (Pty) Ltd and would qualify as input VAT for purposes of calculating the VAT liability of Cape Cookies and/or

**AND** did there and then, by means of the said misrepresentation, induce the representatives from Cape Cookies CC to accept that:

1. The invoices mentioned in Column B of Schedule 1 have been issued by Ensync Network Solutions (Pty) Ltd for actual services rendered and/or goods delivered by Ensync Network Solutions (Pty) Ltd to Cape Cookies and/or

2. The invoices were authorised or ought to be authorised for full and final settlement for the amounts set out in Column D of Schedule 1 in relation to the services and/or goods that were in actual fact rendered to the IT department of Cape Cookies by Ensync Network Solutions (Pty) Ltd and/or

3. The accused was authorised and/or entitled to present for authorisation the said invoices that would result in payment inclusive of VAT by Cape Cookies to Ensync Network Solutions (Pty) Ltd in the amounts as per Column D of Schedule 1 and/or



4. Payment should be made from the business bank account of Cape Cookies to Ensync Network Solutions (Pty) Ltd bank account as per Column F of Schedule 1 and/or

5. Ensync Network Solutions (Pty) Ltd is registered for VAT with SARS with VAT registration number 4470205206 as stipulated on the invoices per Column B of Schedule 1 being valid tax invoices, and/or

6. The VAT portion of the said invoice as per Column E of Schedule 1 is payable to Ensync Network Solutions (Pty) Ltd and would qualify as input VAT for purposes of calculating the VAT liability of Cape Cookies and/or

**WHEREAS** in truth and in fact, the accused when he misrepresented as aforesaid, well knew:-

1. The invoices mentioned in Column B of Schedule 1 were not issued by Ensync Network Solutions (Pty) Ltd and/or

2. The invoices were not authorised or ought not to be authorised for full and final settlement for the amounts set out in Column D of Schedule 1 as the services and/or goods were not in actual fact rendered to the IT department of Cape Cookies for the benefit of Cape Cookies by Ensync Network Solutions (Pty) Ltd and/or

3. The accused abused his power and authorised and/or presented for authorisation the said invoices that would result in payment inclusive of VAT to Ensync Network Solutions (Pty) Ltd in the amounts as per Column D of Schedule 1 and/or

4. Payment should not have been made from the business bank account of Cape Cookies to Ensync Network Solutions (Pty) Ltd with bank account as per Column F of Schedule 1 and/or



5. Ensync Network Solutions (Pty) Ltd was registered for VAT with SARS with VAT registration number 4320172499 and not VAT registration number 4470205206 as stipulated on the invoices per Column B of Schedule 1, which were not valid invoices and/or

6. The VAT portion of the said invoices as per Column E of Schedule 1 was not payable to Ensync Network Solutions (Pty) Ltd and ought not to be use as input VAT for purposes of calculating the VAT liability of Cape Cookies.

**And** that Accused thus committed Fraud.

## ALTERNATIVE TO COUNTS 1 TO 17

**THAT** the accused is guilty of a contravention of Section 59(1)(h) read with Sections 2, 13, 16, 46 and 48 of the Value Added Tax Act, Act 89 of 1991.

**IN** that on or about the dates mentioned in Column A of Schedule 1 and at or near Maitland in the Regional Division of the Cape, the accused wrongfully and with the intent to assist Cape Cookies CC to obtain a refund of tax under the VAT Act to which Cape Cookies CC was not entitled in the amount as set out in Column E of Schedule 1, knowingly issued forged tax invoices as per Column B of Schedule 1 reflecting a VAT amount and an invalid VAT registration number.

[Penalty Clause: A fine or a term of imprisonment not exceeding than 60 months imprisonment]

## COUNTS 18 TO 34

### FORGERY

**IN THAT** on or about the dates mentioned in Column A of Schedule 1 and at or near Maitland, in the Regional Division of the Cape, the accused did unlawfully, falsely and with intent thereby to defraud, and to the prejudice or potential prejudice of Cape Cookies CC forge instruments in writing, to wit, invoices as per Column B of Schedule

1 creating a false document, which purported to be an invoice as per Column B of Schedule 1 for services and/or goods by Ensync Network Solutions (Pty) Ltd.

**WHILST** the accused knew that in actual fact Ensync Network Solutions (Pty) Ltd did not issue the invoices as per Column B of Schedule 1 and/or that the said invoices did not reflect actual transactions and/or supplies rendered to Cape Cookies CC by Ensync Network Solutions (Pty) Ltd.

## COUNTS 35 to 51

### UTTERING

**IN THAT** on or about the dates mentioned in Column A of Schedule 1 and at or near Maitland, in the Regional Division of the Cape, the accused did unlawfully, falsely and with intent thereby to defraud, and to the prejudice or potential prejudice of Cape Cookies CC utter false documents to Cape Cookies CC and/or the representatives of Cape Cookies CC, to wit:- forge instruments in writing, to wit, invoices as per Column B of Schedule 1 whilst the accused knew that the invoices were forged documents that were not issued by Ensycn Network Solutions (Pty) Ltd.

## COUNTS 52 TO 121
### FRAUD
### (DarkCube Biometrics CC -- Schedule 2)

**IN THAT** on or about the dates as mentioned in Column A of Schedule 2, and at or near the business premises of Cape Cookies CC situated at 16 Chapel Street Maitland, in the Regional Division of the Western Cape, the accused unlawfully, falsely and with the intent to defraud, gave out and pretended to Cape Cookies and/or the Chief Financial Officer of Cape Cookies, Leslie Slye and/or other representatives of Cape Cookies, that:



1. The invoices mentioned in Column B of Schedule 2 have been issued by DarkCube Biometrics CC for actual services rendered and/or goods delivered by DarkCube Biometrics CC to Cape Cookies and/or

2. The invoices were authorised or ought to be authorised for full and final settlement for the amounts set out in Column D of Schedule 2 in relation to the services and/or goods that were in actual fact rendered to the IT department of Cape Cookies by DarkCube Biometrics CC and/or

3. The accused was authorised and/or entitled to present for authorisation the said invoices that would result in payment inclusive of VAT by Cape Cookies to DarkCube Biometrics CC in the amounts as per Column D of Schedule 2 and/or

4. Payment should be made from the business bank account of Cape Cookies to DarkCube Biometrics CC's bank account as per Column F of Schedule 2 and/or

5. DarkCube Biometrics CC is registered for VAT with SARS with VAT registration number 4690226792 as stipulated on the invoices per Column B of Schedule 2, being valid tax invoices and/or

6. The VAT portion of the said invoice as per Column E of Schedule 2 is payable to DarkCube Biometrics CC and would qualify as input VAT for purposes of calculating the VAT liability of Cape Cookies and/or

**AND** did there and then, by means of the said misrepresentation, induce the representatives from Cape Cookies CC to accept that:

1. The invoices mentioned in Column B of Schedule 2 have been issued by DarkCube Biometrics CC for actual services rendered and/or goods delivered by DarkCube Biometrics CC to Cape Cookies and/or

2. The invoices were authorised or ought to be authorised for full and final settlement for the amounts set out in Column D of Schedule 2 in relation to the



services and/or goods that were in actual fact rendered to the IT department of Cape Cookies by DarkCube Biometrics CC and/or

3. The accused was authorised and/or entitled to present for authorisation the said invoices that would result in payment inclusive of VAT by Cape Cookies to DarkCube Biometrics CC in the amounts as per Column D of Schedule 2 and/or

4. Payment should be made from the business bank account of Cape Cookies to DarkCube Biometrics CC bank account as per Column F of Schedule 2 and/or

5. DarkCube Biometrics CC is registered for VAT with SARS with VAT registration number 4690226792 as stipulated on the invoices per Column B of Schedule 2 being valid tax invoices, and/or

6. The VAT portion of the said invoice as per Column E of Schedule 2 is payable to DarkCube Biometrics CC and would qualify as input VAT for purposes of calculating the VAT liability of Cape Cookies and/or

**WHEREAS** in truth and in fact, the accused when he misrepresented as aforesaid, well knew:-

1. The invoices mentioned in Column B of Schedule 2 were not issued by DarkCube Biometrics CC and no services were rendered and no goods delivered by DarkCube Biometrics CC to Cape Cookies and/or

2. The invoices were not authorised or ought not to be authorised for full and final settlement for the amounts set out in Column D of Schedule 2 as the services and/or goods were not in actual fact rendered to the IT department of Cape Cookies for the benefit of Cape Cookies by DarkCube Biometrics CC and/or

3. The accused abused his power and authorised and/or presented for authorisation the said invoices that would result in payment inclusive of VAT to DarkCube Biometrics CC in the amounts as per Column D of Schedule 2 and/or



4.  Payment should not have been made from the business bank account of Cape Cookies to DarkCube Biometrics CC with bank account as per Column F of Schedule 2 and/or

5.  DarkCube Biometrics CC was not registered for VAT with SARS and did not have the VAT registration number 4690226792 as stipulated on the invoices per Column B of Schedule 2, which were not valid invoices and/or

6.  The VAT portion of the said invoices as per Column E of Schedule 2 was not payable to DarkCube Biometrics CC and ought not to be used as input VAT for purposes of calculating the VAT liability of Cape Cookies and/or

**And** that Accused thus committed Fraud.

## ALTERNATIVE TO COUNTS 52 TO 121

**THAT** the accused is guilty of a contravention of Section 59(1)(h) read with Sections 2, 13, 16, 46 and 48 of the Value Added Tax Act, Act 89 of 1991.

**IN** that on or about the dates mentioned in Column A of Schedule 2 and at or near Maitland in the Regional Division of the Cape, the accused wrongfully and with the intent to assist Cape Cookies CC to obtain a refund of tax under the VAT Act to which Cape Cookies CC was not entitled in the amount as set out in Column E of Schedule 2, knowingly issued forged tax invoices as per Column B of Schedule 2 reflecting a VAT amount and an invalid VAT registration number.

[Penalty Clause: A fine or a term of imprisonment not exceeding than 60 months imprisonment]



## COUNTS 122 TO 191

**FORGERY**

**IN THAT** on or about the dates mentioned in Column A of Schedule 2 and at or near Maitland, in the Regional Division of the Cape, the accused did unlawfully, falsely and with intent thereby to defraud, and to the prejudice or potential prejudice of Cape Cookies CC forge instruments in writing, to wit, invoices as per Column B of Schedule 2 for services and/or goods by DarkCube Biometrics CC.

**WHILST** the accused knew that the said invoices did not reflect actual transactions and/or supplies rendered to Cape Cookies CC by DarkCube Biometrics CC.

## COUNTS 192 TO 261

**UTTERING**

**IN THAT** on or about the dates mentioned in Column A of Schedule 2 and at or near Maitland, in the Regional Division of the Cape, the accused did unlawfully, falsely and with intent thereby to defraud, and to the prejudice or potential prejudice of Cape Cookies CC utter false documents to Cape Cookies CC and/or the representatives of Cape Cookies CC, to wit:- invoices as per Column B of Schedule 2 whilst the accused knew that the invoices were forged documents that were not issued by DarkCube Biometrics CC.

## COUNTS 262 TO 283
**FRAUD**
**(Jurun Trading CC trading as SolidSource – Schedule 3)**

**IN THAT** on or about the dates as mentioned in Column A of Schedule 3, and at or near the business premises of Cape Cookies CC situated at 16 Chapel Street Maitland, in the Regional Division of the Western Cape, the accused unlawfully, falsely and with the intent to defraud, gave out and pretended to Cape Cookies and/or the



Chief Financial Officer of Cape Cookies, Leslie Slye and/or other representatives of Cape Cookies, that:

1. The invoices mentioned in Column B of Schedule 3 have been issued by SolidSource for actual services rendered and/or goods delivered by SolidSource to Cape Cookies and/or

2. The invoices were authorised or ought to be authorised for full and final settlement for the amounts set out in Column D of Schedule 3 in relation to the services and/or goods that were in actual fact rendered to the IT department of Cape Cookies by SolidSource and/or

3. The accused was authorised and/or entitled to present for authorisation the said invoices that would result in payment inclusive of VAT by Cape Cookies to SolidSource in the amounts as per Column D of Schedule 3 and/or

4. Payment should be made from the business bank account of Cape Cookies to SolidSource bank account as per Column F of Schedule 3 and/or

5. SolidSource is registered for VAT with SARS with VAT registration number 4328441084 as stipulated on the invoices per Column B of Schedule 3 being valid tax invoices, and/or

6. The VAT portion of the said invoice as per Column E of Schedule 3 is payable to SolidSource and would qualify as input VAT for purposes of calculating the VAT liability of Cape Cookies,

**AND** did there and then, by means of the said misrepresentation, induce the representatives from Cape Cookies CC to accept that:

1. The invoices mentioned in Column B of Schedule 3 have been issued by SolidSource for actual services rendered and/or goods delivered by SolidSource to Cape Cookies and/or



2. The invoices were authorised or ought to be authorised for full and final settlement for the amounts set out in Column D of Schedule 3 in relation to the services and/or goods that were in actual fact rendered to the IT department of Cape Cookies by SolidSource and/or

3. The accused was authorised and/or entitled to present for authorisation the said invoices that would result in payment inclusive of VAT by Cape Cookies to SolidSource in the amounts as per Column D of Schedule 3 and/or

4. Payment should be made from the business bank account of Cape Cookies to SolidSource bank account as per Column F of Schedule 3 and/or

5. SolidSource is registered for VAT with SARS with VAT registration number 4328441084 as stipulated on the invoices per Column B of Schedule 3 being valid tax invoices, and/or

6. The VAT portion of the said invoice as per Column E of Schedule 3 is payable to SolidSource and would qualify as input VAT for purposes of calculating the VAT liability of Cape Cookies and/or

**WHEREAS** in truth and in fact, the accused when he misrepresented as aforesaid, well knew:-

1. The invoices mentioned in Column B of Schedule 3 were not issued by SolidSource and no services were rendered and no goods were delivered by SolidSource and/or

2. The invoices were not authorised or ought not to be authorised for full and final settlement for the amounts set out in Column D of Schedule 3 as the services and/or goods were not in actual fact rendered to the IT department of Cape Cookies for the benefit of Cape Cookies by Ensync Network Solutions (Pty) Ltd and/or



3. The accused abused his power and authorised and/or presented for authorisation the said invoices that would result in payment inclusive of VAT to SolidSource in amounts as per Column D of Schedule 3 and/or

4. Payment should not have been made from the business bank account of Cape Cookies to SolidSource with bank account as per Column F of Schedule 3 and/or

5. SolidSource was registered for VAT with SARS with VAT registration number 4320172499 and not VAT registration number 4470205206 as stipulated on the invoices per Column B of Schedule 3, which were not valid invoices and/or

6. The VAT portion of the said invoices as per Column E of Schedule 3 was not payable to SolidSource and ought not to be used as input VAT for purposes of calculating the VAT liability of Cape Cookies.

And that Accused thus committed Fraud.

## ALTERNATIVE TO COUNTS 262 TO 283

**THAT** the accused is guilty of a contravention of Section 59(1)(h) read with Sections 2, 13, 16, 46 and 48 of the Value Added Tax Act, Act 89 of 1991.

**IN** that on or about the dates mentioned in Column A of Schedule 3 and at or near Maitland in the Regional Division of the Cape, the accused wrongfully and with the intent to assist Cape Cookies CC to obtain a refund of tax under the VAT Act to which Cape Cookies CC was not entitled in the amount as set out in Column E of Schedule 3, knowingly issued forged tax invoices as per Column B of Schedule 3 reflecting a VAT amount and an invalid VAT registration number.

[Penalty Clause: A fine or a term of imprisonment not exceeding than 60 months imprisonment]



## COUNTS 284 TO 305

**FORGERY**

**IN THAT** on or about the dates mentioned in Column A of Schedule 3 and at or near Maitland, in the Regional Division of the Cape, the accused did unlawfully, falsely and with intent thereby to defraud, and to the prejudice or potential prejudice of Cape Cookies CC forge instruments in writing, to wit, invoices as per Column B of Schedule 3 for services and/or goods supplied by SolidSource to Cape Cookies.

**WHILST** the accused knew that in actual fact SolidSource did not issue the invoices as per Column B of Schedule 3 and/or that the said invoices did not reflect actual transactions and/or supplies rendered to Cape Cookies CC by SolidSource.

## COUNTS 306 TO 327

**UTTERING**

**IN THAT** on or about the dates mentioned in Column A of Schedule 3 and at or near Maitland, in the Regional Division of the Cape, the accused did unlawfully, falsely and with intent thereby to defraud, and to the prejudice or potential prejudice of Cape Cookies CC utter false documents to Cape Cookies CC and/or the representatives of Cape Cookies CC, to wit:- invoices as per Column B of Schedule 3 whilst the accused knew that the invoices were forged documents that were not issued by SolidSource.

## COUNTS 328 TO 344
**FRAUD**
**(Storvault Africa– Schedule 4)**

**IN THAT** on or about the dates as mentioned in Column A of Schedule 4, and at or near the business premises of Cape Cookies CC situated at 16 Chapel Street Maitland, in the Regional Division of the Western Cape, the accused unlawfully, falsely and with the intent to defraud, gave out and pretended to Cape Cookies and/or the



Chief Financial Officer of Cape Cookies, Leslie Slye and/or other representatives of Cape Cookies, that:

1. The invoices mentioned in Column B of Schedule 4 have been issued by StorVault Africa for actual services rendered and/or goods delivered by StorVault Africa to Cape Cookies and/or

2. The invoices were authorised or ought to be authorised for full and final settlement for the amounts set out in Column D of Schedule 4 in relation to the services and/or goods that were in actual fact rendered to the IT department of Cape Cookies by StorVault Africa and/or

3. The accused was authorised and/or entitled to present for authorisation the said invoices that would result in payment inclusive of VAT by Cape Cookies to StorVault Africa in the amounts as per Column D of Schedule 4 and/or

4. Payment should be made from the business bank account of Cape Cookies to StorVault Africa bank account as per Column F of Schedule 4 and/or

5. StorVault Africa is registered for VAT with SARS with VAT registration number 4377981235 as stipulated on the invoices per Column B of Schedule 4 being valid tax invoices, and/or

6. The VAT portion of the said invoice as per Column E of Schedule 4 is payable to StorVault Africa and would qualify as input VAT for purposes of calculating the VAT liability of Cape Cookies,

**AND** did there and then, by means of the said misrepresentation, induce the representatives from Cape Cookies CC to accept that:

1. The invoices mentioned in Column B of Schedule 4 have been issued by StorVault Africa for actual services rendered and/or goods delivered by StorVault Africa to Cape Cookies and/or



2. The invoices were authorised or ought to be authorised for full and final settlement for the amounts set out in Column D of Schedule 4 in relation to the services and/or goods that were in actual fact rendered to the IT department of Cape Cookies by StorVault Africa and/or

3. The accused was authorised and/or entitled to present for authorisation the said invoices that would result in payment inclusive of VAT by Cape Cookies to StorVault Africa in the amounts as per Column D of Schedule 4 and/or

4. Payment should be made from the business bank account of Cape Cookies to StorVault Africa bank account as per Column F of Schedule 4 and/or

5. StorVault Africa is registered for VAT with SARS with VAT registration number 4377981235 as stipulated on the invoices per Column B of Schedule 4 being valid tax invoices, and/or

6. The VAT portion of the said invoice as per Column E of Schedule 4 is payable to StorVault Africa and would qualify as input VAT for purposes of calculating the VAT liability of Cape Cookies.

**WHEREAS** in truth and in fact, the accused when he misrepresented as aforesaid, well knew:-

1. The invoices mentioned in Column B of Schedule 4 were not issued by StorVault Africa and no services were rendered and no goods were delivered by StorVault to Cape Cookies and/or

2. The invoices were not authorised or ought not to be authorised for full and final settlement for the amounts set out in Column D of Schedule 4 as the services and/or goods were not in actual fact rendered to the IT department of Cape Cookies for the benefit of Cape Cookies by StorVault Africa and/or



3. The accused abused his power and authorised and/or presented for authorisation the said invoices that would result in payment inclusive of VAT to StorVault Africa in amounts as per Column D of Schedule 4 and/or

4. Payment should not have been made from the business bank account of Cape Cookies to StorVault Africa with bank account as per Column F of Schedule 4 and/or

5. StorVault Africa was not registered for VAT with VAT registration number 4377981235 as stipulated on the invoices per Column B of Schedule 4, which were not valid invoices and/or

6. The VAT portion of the said invoices as per Column E of Schedule 4 was not payable to StorVault Africa and ought not to be use as input VAT for purposes of calculating the VAT liability of Cape Cookies.

**And** that Accused thus committed Fraud.

## ALTERNATIVE TO COUNTS 328 TO 344

**THAT** the accused is guilty of a contravention of Section 59(1)(h) read with Sections 2, 13, 16, 46 and 48 of the Value Added Tax Act, Act 89 of 1991.

**IN** that on or about the dates mentioned in Column A of Schedule 4 and at or near Maitland in the Regional Division of the Cape, the accused wrongfully and with the intent to assist Cape Cookies CC to obtain a refund of tax under the VAT Act to which Cape Cookies CC was not entitled in the amount as set out in Column E of Schedule 4, knowingly issued forged tax invoices as per Column B of Schedule 4 reflecting a VAT amount and an invalid VAT registration number.

[Penalty Clause: A fine or a term of imprisonment not exceeding than 60 months imprisonment]



**COUNTS 345 TO 361**

**FORGERY**

**IN THAT** on or about the dates mentioned in Column A of Schedule 4 and at or near Maitland, in the Regional Division of the Cape, the accused did unlawfully, falsely and with intent thereby to defraud, and to the prejudice or potential prejudice of Cape Cookies CC forge instruments in writing, to wit, invoices as per Column B of Schedule 4 for services and/or goods by StorVault Africa.

**WHILST** the accused knew that in actual fact StorVault Africa did not issue the invoices as per Column B of Schedule 4 and/or that the said invoices did not reflect actual transactions and/or supplies rendered to Cape Cookies CC by StorVault Africa.

**COUNTS 362 TO 378**

**UTTERING**

**IN THAT** on or about the dates mentioned in Column A of Schedule 4 and at or near Maitland, in the Regional Division of the Cape, the accused did unlawfully, falsely and with intent thereby to defraud, and to the prejudice or potential prejudice of Cape Cookies CC utter false documents to Cape Cookies CC and/or the representatives of Cape Cookies CC, to wit:- invoices as per Column B of Schedule 4 whilst the accused knew that the invoices were forged documents that were not issued by StorVault Africa.



| SCHEDULE 1 | | COLUMN B | COLUMN C | COLUMN D | COLUMN E | COLUMN F | |
|---|---|---|---|---|---|---|---|
| COUNT | COLUMN A | | | | | | |
| | Date | Invoice description | Service Provider | Total amount of invoice | VAT portion indicated on invoice | Bank account details of service provider stipulated on invoice | |
| 1, 18 and 35 | Tuesday, 04 May 2010 | Quote no. QO2614 | Ensync Network Solutions (Pty) Ltd | 34 792,80 | 4 272,80 | ABSA Bank | 7260 |
| 2, 19 and 36 | Tuesday, 04 May 2010 | Quote no. QO2615 | Ensync Network Solutions (Pty) Ltd | 25 080,00 | 3 080,00 | ABSA Bank | 7260 |
| 3, 20 and 37 | Tuesday, 19 October 2010 | Quote no. QO2619 | Ensync Network Solutions (Pty) Ltd | 22 144,50 | 2 719,50 | ABSA Bank | 7260 |
| 4, 21 and 38 | Tuesday, 19 October 2010 | Quote no. QO2623 | Ensync Network Solutions (Pty) Ltd | 6 609,60 | 810,60 | ABSA Bank | 7260 |
| 5, 22 and 39 | Monday, 25 October 2010 | Quote no. QO2620 | Ensync Network Solutions (Pty) Ltd | 41 485,06 | 5 094,66 | ABSA Bank | 7260 |
| 6, 23 and 40 | Monday, 29 November 2010 | Quote no. QO2620 | Ensync Network Solutions (Pty) Ltd | 43 673,86 | 5 363,46 | ABSA Bank | 7260 |
| 7, 24 and 41 | Tuesday, 07 December 2010 | Quote no. QO2697 | Ensync Network Solutions (Pty) Ltd | 2 029,20 | 249,20 | ABSA Bank | 7260 |
| 8, 25 and 42 | Tuesday, 07 December 2010 | Quote no. QO2697 | Ensync Network Solutions (Pty) Ltd | 1 960,80 | 240,80 | ABSA Bank | 7260 |
| 9, 26 and 43 | Monday, 20 December 2010 | Invoice no. QO2711 | Ensync Network Solutions (Pty) Ltd | 43 673,86 | 5 363,46 | ABSA Bank | 7260 |
| 10, 27 and 44 | Tuesday, 25 January 2011 | Invoice no. QO2716 | Ensync Network Solutions (Pty) Ltd | 43 673,86 | 5 363,46 | ABSA Bank | 7260 |
| 11, 28 and 45 | Friday, 04 February 2011 | Quote no. QO2731 | Ensync Network Solutions (Pty) Ltd | 1 812,60 | 222,60 | ABSA Bank | 7260 |
| 12, 29 and 46 | Monday, 28 February 2011 | Invoice no. QO2739 | Ensync Network Solutions (Pty) Ltd | 46 401,88 | 5 698,48 | ABSA Bank | 7260 |
| 13, 30 and 47 | Wednesday, 02 March 2011 | Quote no. QO2743 | Ensync Network Solutions (Pty) Ltd | 2 091,90 | 256,90 | ABSA Bank | 7260 |
| 14, 31 and 48 | Friday, 25 March 2011 | Invoice no. QO2747 | Ensync Network Solutions (Pty) Ltd | 46 401,88 | 5 698,48 | ABSA Bank | 7260 |
| 15, 32 and 49 | Tuesday, 05 April 2011 | Quote no. QO2761 | Ensync Network Solutions (Pty) Ltd | 2 175,12 | 267,12 | ABSA Bank | 7260 |
| 16, 33 and 50 | Thursday, 28 April 2011 | Invoice no. QO2759 | Ensync Network Solutions (Pty) Ltd | 46 401,88 | 5 698,48 | ABSA Bank | 7260 |
| 17, 34 and 51 | Tuesday, 31 May 2011 | Invoice no. QO2762 | Ensync Network Solutions (Pty) Ltd | 46 401,88 | 5 698,48 | ABSA Bank | 7260 |



Case 3:21-mj-04149   Document 31-1   Filed 01/31/22   Page 67 of 102 PageID #: 454

| COUNT | COLUMN A | COLUMN B | COLUMN C | COLUMN D | COLUMN E | COLUMN F | |
|---|---|---|---|---|---|---|---|
| | Date | Invoice description | Service Provider | Total amount of invoice | VAT portion indicated on invoice | Bank account details of service provider stipulated on invoice | |
| 52, 122 and 192 | Monday, 30 November 2009 | DC1092380231 | DarkCube Biometrics | 1 254,00 | 154,00 | ABSA bank | 2919 |
| 53, 123 and 193 | Tuesday, 01 December 2009 | DC1092380236 | DarkCube Biometrics | 1 231,20 | 151,20 | ABSA bank | 2919 |
| 54, 124 and 194 | Thursday, 03 December 2009 | DC1092380241 | DarkCube Biometrics | 1 846,80 | 226,80 | ABSA bank | 2919 |
| 55, 125 and 195 | Friday, 04 December 2009 | DC1092380246 | DarkCube Biometrics | 2 462,40 | 302,40 | ABSA bank | 2919 |
| 56, 126 and 196 | Tuesday, 29 December 2009 | DC1092380299 | DarkCube Biometrics | 1 231,20 | 151,20 | ABSA bank | 2919 |
| 57, 127 and 197 | Wednesday, 06 January 2010 | DC1092380298 | DarkCube Biometrics | 1 846,80 | 226,80 | ABSA bank | 2919 |
| 58, 128 and 198 | Friday, 22 January 2010 | DC1092380549 | DarkCube Biometrics | 1 846,80 | 226,80 | ABSA bank | 2919 |
| 59, 129 and 199 | Monday, 25 January 2010 | DC1092380555 | DarkCube Biometrics | 1 938,00 | 238,00 | ABSA bank | 2919 |
| 60, 130 and 200 | Thursday, 28 January 2010 | DC1092380589 | DarkCube Biometrics | 1 231,20 | 151,20 | ABSA bank | 2919 |
| 61, 131 and 201 | Thursday, 04 February 2010 | DC1092380598 | DarkCube Biometrics | 12 904,80 | 1 584,80 | ABSA bank | 2919 |
| 62, 132 and 202 | Tuesday, 09 February 2010 | DC1092380599 | DarkCube Biometrics | 615,60 | 75,60 | ABSA bank | 2919 |
| 63, 133 and 203 | Tuesday, 09 February 2010 | DC1092380610 | DarkCube Biometrics | 1 938,00 | 238,00 | ABSA bank | 2919 |
| 64, 134 and 204 | Thursday, 18 February 2010 | DC1092380621 | DarkCube Biometrics | 798,00 | 98,00 | ABSA bank | 2919 |
| 65, 135 and 205 | Thursday, 18 February 2010 | DC1092380920 | DarkCube Biometrics | 820,80 | 100,80 | ABSA bank | 2919 |
| 66, 136 and 206 | Thursday, 18 February 2010 | DC1092380619 | DarkCube Biometrics | 1 812,60 | 222,60 | ABSA bank | 2919 |
| 67, 137 and 207 | Thursday, 04 March 2010 | DC1092380538 | DarkCube Biometrics | 1 231,20 | 151,20 | ABSA bank | 2919 |
| 68, 138 and 208 | Thursday, 04 March 2010 | DC1092380634 | DarkCube Biometrics | 615,60 | 75,60 | ABSA bank | 2919 |
| 69, 139 and 209 | Friday, 05 March 2010 | DC1092380640 | DarkCube Biometrics | 1 641,60 | 201,60 | ABSA bank | 2919 |
| 70, 140 and 210 | Tuesday, 16 March 2010 | DC1092380653 | DarkCube Biometrics | 14 227,20 | 1 747,20 | ABSA bank | 2919 |
| 71, 141 and 211 | Tuesday, 13 April 2010 | DC1092380679 | DarkCube Biometrics | 1 288,20 | 158,20 | ABSA bank | 2919 |
| 72, 142 and 212 | Thursday, 22 April 2010 | DC1092380722 | DarkCube Biometrics | 3 933,00 | 483,00 | ABSA bank | 2919 |
| 73, 143 and 213 | Thursday, 22 April 2010 | DC1092380722 | DarkCube Biometrics | 6 498,00 | 798,00 | ABSA bank | 2919 |
| 74, 144 and 214 | Thursday, 22 April 2010 | DC1092380793 | DarkCube Biometrics | 1 379,40 | 169,40 | ABSA bank | 2919 |
| 75, 145 and 215 | Thursday, 22 April 2010 | DC1092380761 | DarkCube Biometrics | 1 687,20 | 207,20 | ABSA bank | 2919 |
| 76, 146 and 216 | Thursday, 22 April 2010 | DC1092380799 | DarkCube Biometrics | 1 824,00 | 224,00 | ABSA bank | 2919 |
| 77, 147 and 217 | Thursday, 22 April 2010 | DC1092380804 | DarkCube Biometrics | 1 671,24 | 205,24 | ABSA bank | 2919 |
| 78, 148 and 218 | Thursday, 22 April 2010 | DC1092380807 | DarkCube Biometrics | 877,40 | 107,75 | ABSA bank | 2919 |
| 79, 149 and 219 | Thursday, 22 April 2010 | DC1092380806 | DarkCube Biometrics | 11 035,20 | 1 355,20 | ABSA bank | 2919 |
| 80, 150 and 220 | Thursday, 22 April 2010 | DC1092380833 | DarkCube Biometrics | 12 768,00 | 1 568,00 | ABSA bank | 2919 |
| 81, 151 and 221 | Thursday, 22 April 2010 | DC1092380835 | DarkCube Biometrics | 889,20 | 109,20 | ABSA bank | 2919 |
| 82, 152 and 222 | Thursday, 22 April 2010 | DC1092380821 | DarkCube Biometrics | 2 200,20 | 270,20 | ABSA bank | 2919 |
| 83, 153 and 223 | Thursday, 22 April 2010 | DC1092380824 | DarkCube Biometrics | 2 154,60 | 264,60 | ABSA bank | 2919 |
| 84, 154 and 224 | Thursday, 22 April 2010 | DC1092380839 | DarkCube Biometrics | 1 140,00 | 140,00 | ABSA bank | 2919 |



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 85, 155 and 225 | Thursday, 22 April 2010 | DC1092380844 | DarkCube Biometrics | 13 338,00 | 1 638,00 | ABSA bank | 2919 |
| 86, 156 and 226 | Thursday, 22 April 2010 | DC1092380847 | DarkCube Biometrics | 615,60 | 75,60 | ABSA bank | 2919 |
| 87, 157 and 227 | Thursday, 22 April 2010 | DC1092380701 | DarkCube Biometrics | 1 026,00 | 126,00 | ABSA bank | 2919 |
| 88, 158 and 228 | Thursday, 22 April 2010 | DC1092380855 | DarkCube Biometrics | 61 674,00 | 7 574,00 | ABSA bank | 2919 |
| 89, 159 and 229 | Thursday, 22 April 2010 | DC1092380858 | DarkCube Biometrics | 1 288,20 | 158,20 | ABSA bank | 2919 |
| 90, 160 and 230 | Thursday, 22 April 2010 | DC1092380857 | DarkCube Biometrics | 2 200,20 | 270,20 | ABSA bank | 2919 |
| 91, 161 and 231 | Thursday, 22 April 2010 | DC1092380859 | DarkCube Biometrics | 1 846,80 | 226,80 | ABSA bank | 2919 |
| 92, 162 and 232 | Thursday, 22 April 2010 | DC1092380599 | DarkCube Biometrics | 1 048,80 | 128,80 | ABSA bank | 2919 |
| 93, 163 and 233 | Thursday, 16 September 2010 | DC1092380861 | DarkCube Biometrics | 1 938,00 | 238,00 | ABSA bank | 2919 |
| 94, 164 and 234 | Friday, 17 September 2010 | DC1092380873 | DarkCube Biometrics | 22 663,20 | 2 783,20 | ABSA bank | 2919 |
| 95, 165 and 235 | Monday, 20 September 2010 | DC1092380878 | DarkCube Biometrics | 38 714,40 | 4 754,40 | ABSA bank | 2919 |
| 96, 166 and 236 | Thursday, 07 October 2010 | DC1092380883 | DarkCube Biometrics | 2 599,20 | 319,20 | ABSA bank | 2919 |
| 97, 167 and 237 | Thursday, 14 October 2010 | DC1092380891 | DarkCube Biometrics | 1 801,20 | 221,20 | ABSA bank | 2919 |
| 98, 168 and 238 | Wednesday, 27 October 2010 | DC1092380928 | DarkCube Biometrics | 17 898,00 | 2 198,00 | ABSA bank | 2919 |
| 99, 169 and 239 | Friday, 29 October 2010 | DC1092380933 | DarkCube Biometrics | 26 573,40 | 3 263,40 | ABSA bank | 2919 |
| 100, 170 and 240 | Thursday, 04 November 2010 | DC1092380938 | DarkCube Biometrics | 9 348,00 | 1 148,00 | ABSA bank | 2919 |
| 101, 171 and 241 | Wednesday, 10 November 2010 | DC1092380948 | DarkCube Biometrics | 4 058,40 | 498,40 | ABSA bank | 2919 |
| 102, 172 and 242 | Friday, 03 December 2010 | DC1092380954 | DarkCube Biometrics | 1 744,20 | 214,20 | ABSA bank | 2919 |
| 103, 173 and 243 | Friday, 03 December 2010 | DC1092380951 | DarkCube Biometrics | 1 447,80 | 177,80 | ABSA bank | 2919 |
| 104, 174 and 244 | Tuesday, 21 December 2010 | DC1092380963 | DarkCube Biometrics | 60 986,20 | 7 489,53 | ABSA bank | 2919 |
| 105, 175 and 245 | Monday, 10 January 2011 | DC1092380969 | DarkCube Biometrics | 2 166,00 | 266,00 | ABSA bank | 2919 |
| 106, 176 and 246 | Wednesday, 19 January 2011 | DC1092380973 | DarkCube Biometrics | 2 017,80 | 247,80 | ABSA bank | 2919 |
| 107, 177 and 247 | Friday, 04 March 2011 | DC1092381484 | DarkCube Biometrics | 17 784,00 | 2 184,00 | ABSA bank | 2919 |
| 108, 178 and 248 | Wednesday, 09 March 2011 | DC1092381485 | DarkCube Biometrics | 23 712,00 | 2 912,00 | ABSA bank | 2919 |
| 109, 179 and 249 | Monday, 14 March 2011 | DC1092381486 | DarkCube Biometrics | 18 126,00 | 2 226,00 | ABSA bank | 2919 |
| 110, 180 and 250 | Monday, 28 March 2011 | DC1092381509 | DarkCube Biometrics | 13 286,70 | 1 631,70 | ABSA bank | 2919 |
| 111, 181 and 251 | Thursday, 31 March 2011 | DC1092381487 | DarkCube Biometrics | 13 286,70 | 1 631,70 | ABSA bank | 2919 |
| 112, 182 and 252 | Friday, 08 April 2011 | DC1092381483 | DarkCube Biometrics | 20 325,06 | 2 496,06 | ABSA bank | 2919 |
| 113, 183 and 253 | Tuesday, 26 April 2011 | DC1092381428 | DarkCube Biometrics | 47 988,30 | 5 893,30 | ABSA bank | 2919 |
| 114, 184 and 254 | Wednesday, 04 May 2011 | DC1092381488 | DarkCube Biometrics | 1 744,20 | 214,20 | ABSA bank | 2919 |
| 115, 185 and 255 | Wednesday, 04 May 2011 | DC1092381489 | DarkCube Biometrics | 1 938,00 | 238,00 | ABSA bank | 2919 |
| 116, 186 and 256 | Wednesday, 04 May 2011 | DC1092381490 | DarkCube Biometrics | 786,60 | 96,60 | ABSA bank | 2919 |
| 117, 187 and 257 | Tuesday, 17 May 2011 | DC1092381498 | DarkCube Biometrics | 2 205,90 | 270,90 | ABSA bank | 2919 |
| 118, 188 and 258 | Tuesday, 24 May 2011 | DC1092381503 | DarkCube Biometrics | 12 802,20 | 1 572,20 | ABSA bank | 2919 |
| 119, 189 and 259 | Tuesday, 24 May 2011 | DC1092381504 | DarkCube Biometrics | 1 972,20 | 242,20 | ABSA bank | 2919 |
| 120, 190 and 260 | Wednesday, 25 May 2011 | DC1092381506 | DarkCube Biometrics | 21 055,80 | 2 585,80 | ABSA bank | 2919 |
| 121, 191 and 261 | Friday, 27 May 2011 | DC1092381508 | DarkCube Biometrics | 1 972,20 | 242,20 | ABSA bank | 2919 |



000040

| COUNT | COLUMN A | COLUMN B | COLUMN C | COLUMN D | COLUMN E | COLUMN F | |
|---|---|---|---|---|---|---|---|
| | Date | Invoice description | Service Provider | Total amount of invoice | VAT portion indicated on invoice | Bank account details of service provider stipulated on invoice | |
| 262, 284 and 306 | Friday, 26 March 2010 | C-2848 | SolidSource | 17 784,00 | 2 184,00 | ABSA bank | 3591 |
| 263, 285 and 307 | Thursday, 01 April 2010 | C-2850 | SolidSource | 41 570,10 | 5 105,10 | ABSA bank | 3591 |
| 264, 286 and 308 | Monday, 26 July 2010 | C-3133 | SolidSource | 1 778,40 | 218,40 | ABSA bank | 3591 |
| 265, 287 and 309 | Wednesday, 28 July 2010 | C-3298 | SolidSource | 47 424,00 | 5 824,00 | ABSA bank | 3591 |
| 266, 288 and 310 | Monday, 02 August 2010 | C-3314 | SolidSource | 2 050,00 | 252,00 | ABSA bank | 3591 |
| 267, 289 and 311 | Monday, 16 August 2010 | C-3317 | SolidSource | 2 052,00 | 252,00 | ABSA bank | 3591 |
| 268, 290 and 312 | Friday, 20 August 2010 | C-3319 | SolidSource | 3 420,00 | 420,00 | ABSA bank | 3591 |
| 269, 291 and 313 | Thursday, 26 August 2010 | C-3322 | SolidSource | 2 052,00 | 252,00 | ABSA bank | 3591 |
| 270, 292 and 314 | Monday, 06 September 2010 | C-3327 | SolidSource | 2 052,00 | 252,00 | ABSA bank | 3591 |
| 271, 293 and 315 | Monday, 20 September 2010 | C-3329 | SolidSource | 18 810,00 | 2 310,00 | ABSA bank | 3591 |
| 272, 294 and 316 | Thursday, 07 October 2010 | C-3338 | SolidSource | 10 032,00 | 1 232,00 | ABSA bank | 3591 |
| 273, 295 and 317 | Tuesday, 09 November 2010 | C-3347 | SolidSource | 51 870,00 | 6 370,00 | ABSA bank | 3591 |
| 274, 296 and 318 | Monday, 22 November 2010 | C-3349 | SolidSource | 2 736,00 | 336,00 | ABSA bank | 3591 |
| 275, 297 and 319 | Friday, 03 December 2010 | C-3350 | SolidSource | 2 052,00 | 252,00 | ABSA bank | 3591 |
| 276, 298 and 320 | Monday, 10 January 2011 | C-3350 | SolidSource | 2 052,00 | 252,00 | ABSA bank | 3591 |
| 277, 299 and 321 | Wednesday, 19 January 2011 | C-3353 | SolidSource | 2 052,00 | 252,00 | ABSA bank | 3591 |
| 278, 300 and 322 | Monday, 07 February 2011 | C-3359 | SolidSource | 1 938,00 | 238,00 | ABSA bank | 3591 |
| 279, 301 and 323 | Friday, 11 February 2011 | C-3359 | SolidSource | 6 270,00 | 770,00 | ABSA bank | 3591 |
| 280, 302 and 324 | Friday, 11 February 2011 | C-3361 | SolidSource | 2 052,00 | 252,00 | ABSA bank | 3591 |
| 281, 303 and 325 | Thursday, 24 March 2011 | C-3363 | SolidSource | 1 938,00 | 238,00 | ABSA bank | 3591 |
| 282, 304 and 326 | Tuesday, 24 May 2011 | C-3362 | SolidSource | 2 052,00 | 252,00 | ABSA bank | 3591 |
| 283, 305 and 327 | Friday, 27 May 2011 | C-3362 | SolidSource | 2 052,00 | 252,00 | ABSA bank | 3591 |

SCHEDULE 3



000041

| | SCHEDULE 4 | | | | | | |
|---|---|---|---|---|---|---|---|
| COUNT | COLUMN A | COLUMN B | COLUMN C | COLUMN D | COLUMN E | COLUMN F | |
| | Date | Invoice description | Service Provider | Total amount of invoice | VAT portion indicated on invoice | Bank account details of service provider stipulated on invoice | |
| 328, 345 and 362 | Thursday, 01 April 2010 | 91992-2 | StorVault Africa | 12 706,33 | 1 560,43 | ABSA bank | 4866 |
| 329, 346 and 363 | Thursday, 01 April 2010 | 91992-1 | StorVault Africa | 48 906,00 | 6 006,00 | ABSA bank | 4866 |
| 330, 347 and 364 | Tuesday, 13 April 2010 | 91992-3 | StorVault Africa | 889,20 | 109,20 | ABSA bank | 4866 |
| 331, 348 and 365 | Wednesday, 21 April 2010 | 91992-4 | StorVault Africa | 36 936,00 | 4 536,00 | ABSA bank | 4866 |
| 332, 349 and 366 | Tuesday, 20 July 2010 | 91992-6 | StorVault Africa | 13 235,40 | 1 625,40 | ABSA bank | 4866 |
| 333, 350 and 367 | Monday, 02 August 2010 | 91992-7 | StorVault Africa | 1 980,18 | 243,18 | ABSA bank | 4866 |
| 334, 351 and 368 | Thursday, 26 August 2010 | 91992-7 | StorVault Africa | 549,42 | 67,47 | ABSA bank | 4866 |
| 335, 352 and 369 | Thursday, 09 September 2010 | 91992-8 | StorVault Africa | 1 648,27 | 202,42 | ABSA bank | 4866 |
| 336, 353 and 370 | Thursday, 14 October 2010 | 91992-9 | StorVault Africa | 1 648,27 | 202,42 | ABSA bank | 4866 |
| 337, 354 and 371 | Friday, 29 October 2010 | 91992-10 | StorVault Africa | 1 648,27 | 202,42 | ABSA bank | 4866 |
| 338, 355 and 372 | Tuesday, 07 December 2010 | 91992-11 | StorVault Africa | 1 615,95 | 198,45 | ABSA bank | 4866 |
| 339, 356 and 373 | Monday, 10 January 2011 | 91992-12 | StorVault Africa | 1 949,40 | 239,40 | ABSA bank | 4866 |
| 340, 357 and 374 | Friday, 11 February 2011 | 91992-11 | StorVault Africa | 5 950,80 | 730,80 | ABSA bank | 4866 |
| 341, 358 and 375 | Friday, 11 February 2011 | 91992-12 | StorVault Africa | 2 093,04 | 257,04 | ABSA bank | 4866 |
| 342, 359 and 376 | Friday, 11 February 2011 | 91992-13 | StorVault Africa | 2 235,54 | 274,54 | ABSA bank | 4866 |
| 343, 360 and 377 | Friday, 11 February 2011 | 91992-14 | StorVault Africa | 2 235,54 | 274,54 | ABSA bank | 4866 |
| 344, 361 and 378 | Wednesday, 11 May 2011 | 91992-14 | StorVault Africa | 12 034,98 | 1 477,98 | ABSA bank | 4866 |
| | | | Total | 148 262,59 | 18 207,69 | | |



000042

---

**SUPPORTING AFFIDAVIT**

---

I, the undersigned,


**STEVEN PRITCHARD**


declare on oath that:


## A.    INTRODUCTION


1      I am employed as a Detective Sergeant at the Maitland Detective Branch of the

       South African Police Service (SAPS), 236 Voortrekker Road Maitland, Cape

       Town, South Africa with contact details 021 – 5069400 / 0837417983.


2      I am the investigating officer in the matter which is investigated under Maitland

       CAS 328/08/2012.


3      As such I have knowledge of the evidence obtained against Ricardo Paolo

       Spagni (Spagni), the accused in the matter and Spagni's subsequent court

       appearances.


4      The content of this affidavit falls within my own knowledge unless the context

       indicates otherwise. It is to the best of my knowledge, true and correct.

1

## B. THE PROCEDURAL HISTORY OF THE MATTER PRIOR TO ENROLMENT

5    Spagni was employed by Cape Cookies CC ("Cape Cookies") for the period 1 October 2009 to 8 June 2011 as Information Technology Manager (IT Manager) at which time his employment relationship with Cape Cookies was terminated by mutual agreement.

6    In November 2011 Cape Cookies laid a complaint with SAPS and SAPS registered this complaint as an enquiry. The purpose of a SAPS enquiry is to ascertain whether there are sufficient grounds to register a police docket in order to investigate a matter. The enquiry serves as a screening mechanism. It finds particular application in commercial crime matters.

7    On completion of the inquiry in August 2012, SAPS decided to register an investigation as Maitland CAS 328/08/2012, being the police station and docket registration number.

8    On 13 September 2012, the then investigating officer arrested Spagni and formally warned him of the charges.

9    The prosecutor did not pursue the charges by enrolling the matter at that stage. This was to enable further investigation into the matter.

2

10    It should be noted that SAPS only have an investigative function in such matters. The decision to prosecute lies with the National Prosecuting Authority (NPA), who may decide to "*nolle prosequi*" the matter.

11    There was never a decision to "*nolle prosequi*" the matter. As I have stated above the matter was not enrolled because the prosecutor was of the view that the matter should be referred back to SAPS as the investigation was incomplete. I was required to take over the investigation of the matter in April 2015.

12    The SAPS investigation was completed in August 2017. The NPA was satisfied that there was a *prima facie* case against Spagni. I was instructed to trace Spagni in order to secure his attendance at court. I was initially unable to do so. I was then formally instructed by the prosecutor to apply for a J50 warrant (in terms of section 43 of the *Criminal Procedure Act, No. 51 of 1977(CPA)*) to be authorised by a magistrate. I did so and a J50 warrant was authorised. I then took further steps to execute the warrant. Spagni pre-empted the execution of the warrant by presenting himself at court on 24 August 2017. Instead of appearing in court on the warrant, the prosecutor issued a summons to appear in court (in terms of section 38 of the *CPA*).

C.    **FACTS OF THE MATTER AND EVIDENCE GATHERED IN THE COURSE OF THE INVESTIGATION**

13.    The complainant in the matter, Cape Cookies CC ("Cape Cookies") is a Close Corporation registered in terms of the Close Corporation Act, No. 69 of 1984. It

3

operates a biscuit manufacturing and marketing business from their business address in Maitland, Cape Town.

14. As already mentioned Spagni was employed by Cape Cookies as the Information Technology Manager (IT Manager) of the business for the period 1 October 2009 to 8 June 2011 at which time his employment relationship with Cape Cookies was terminated by mutual agreement.

**Counts 1 to 51 (Ensync invoices - Schedule 1 of the charge sheet)**

15. Prior to and whilst Spagni was employed as the IT Manager of Cape Cookies, the business had an IT supplier, EOH Mthombo (Pty) Ltd trading as Ensync Network Solutions (Pty) Ltd (Ensync).

16. Ensync provided IT related goods and/or services on a regular basis to Cape Cookies and issued invoices accordingly.

17. As the IT Manager of Cape Cookies, Spagni received the invoices from Ensync for the IT related goods and/or services that were provided.

18. Spagni's responsibility was to validate the Ensync invoices he received and present them to the accounts section of Cape Cookies to ensure that the amount due would be paid to Ensync.

4

19. Ensync was registered for Value Added Tax (VAT) with the South African Revenue Services (SARS). Accordingly, the invoices Ensync issued to Cape Cookies were valid tax invoices, which were inclusive of 14 percent VAT.

20. As Cape Cookies were liable to pay the 14 percent VAT to Ensync, they were entitled to deduct the equivalent amount as input tax from the amount of output tax, which they were to pay over to the SARS. The deduction of input tax from output tax was reflected on the bi-monthly VAT return, which Cape Cookies submitted to the SARS and in terms of which their VAT liability was calculated. This process was regulated by the provisions of the Value-Added Tax Act, Act 89 of 1991.

21. Spagni however intercepted the invoices that Ensync issued to Cape Cookies in respect of IT related goods and/or services that Ensync rendered to Cape Cookies.

22. Spagni forged similar invoices using false information purporting to be from Ensync reflecting false VAT number, company details and ABSA bank account details) and inflated the prices for the goods and/or services.

23. Spagni then instead of presenting the genuine invoices, which he received from Ensync, presented the forged invoices to the accounts department of Cape Cookies for payment.

5

24. Cape Cookies acted on the authority of Spagni and paid the invoices that Spagni submitted for payment by means of electronic funds transfer (eft) into the bank account reflected on the forged invoice that Spagni submitted.

25. Ms Jade Naik (Naik) on behalf Ensync testified that the amounts reflected on the original invoices that Ensync issued were in actual fact paid into Ensync's Nedbank account, except the very last one.

26. Naik testified that the invoices that Spagni presented to Cape Cookies do not originate from Ensync. Whilst she testified in Spagni's trial the original invoices that Ensync issued to Cape Cookies were submitted to Court as exhibits.

27. Naik highlighted in her evidence to the Court the differences between the invoices issued by Ensync to Cape Cookies and the forged invoices reflecting inflated amounts submitted by Spagni to Cape Cookies for payment.

28. ABSA bank provided a statement in relation to the ABSA account number that appears on the forged invoices. They provided details of the account holder and bank statements for the particular account.

29. The bank statements show the eft deposits that Cape Cookies made into the account.

30. The opening documents for this account from ABSA indicate that Spagni opened the bank account and that he is the account holder of the bank account.

6

31. The evidence indicates that Spagni forged and presented the false invoices and that this misrepresentation to Cape Cookies was perpetrated during the period May 2010 to May 2011 as per Schedule 1 of the charge sheet.

32. The crime was discovered when Ensync contacted Cape Cookies to enquire about an unpaid invoice for services rendered to Cape Cookies and supplied Cape Cookies with a copy of the unpaid invoice.

33. The Financial Manager of Cape Cookies at the time, Mr Lesley Slye, that has already testified in the trial, indicated that Cape Cookies could not locate the unpaid invoice that Ensync forwarded to Cape Cookies.

34. Cape Cookies however did locate the forged invoices that Spagni supplied to the accounts department for the period May 2010 to May 2011 and compared those invoices with the one that Ensync forwarded and noticed that the bank account reflected and other information was not the same.

35. Mr Dawid O Roberts was appointed by Cape Cookies to do a thorough forensic investigation and later on Mr Gary Miller from Credence Forensic Services was requested to assist in preparing the case file to be submitted to the SAPS for further criminal investigation.



7

**Counts 52 to 261 (Schedule 2 of the charge sheet)**

36.     The forensic investigation revealed that in addition to the offences as per counts 1 to 51, there were also other invoices from three suspicious IT service providers that Spagni presented for payment to Cape Cookies.

37.     The accounts section of Cape Cookies also paid these three IT suppliers by way of eft payment to the bank account reflected on these invoices. This was done on the confirmation given by Spagni that these suppliers had in fact rendered the IT goods and/or services to Cape Cookies.

38.     The investigation found that these three IT service providers did not exist. It was the evidence of Mr Slye that since Mr Spagni's departure from Cape Cookies none of the three "service providers" had made any contact with Cape Cookies and that Cape Cookies could also not trace any of the three "IT "service providers".

Dark Cube Biometrics Close Corporation

39.     In the period November 2009 to May 2011 Cape Cookies settled invoices for IT related goods and/or services that purported to be rendered by Dark Cube Biometrics Close Corporation (Dark Cube) that were submitted for payment by Spagni.

40.     The investigation revealed that Dark Cube was registered at the Companies Registration Offices of South Africa.

8

41. The registration number on the invoices belong to Dust Technology CC, an entity of which Spagni had 50 percent shares according to the Company Registrations Office.

42. The VAT number on the Dark Cube invoices is not a valid number according to the South African Revenue Services.

43. ABSA bank also confirmed that the bank account appearing on the Dark Cube invoices was opened by Spagni and that he is also the account holder of this bank account.

44. The bank statements received from ABSA for this account reflect that Cape Cookies made eft payments into this account in accordance with the forged invoices that Spagni presented to the accounts department for payment.

45. The physical address and telephonic contact details stipulated on invoices purporting to originate from Dark Cube could not be traced by the forensic investigator or myself.

**Counts 262 to 327 (Schedule 3 to the charge sheet)**

Jarun Trading CC trading as SolidSource

46. The evidence further discloses that for the period March 2010 to May 2011 Spagni also forged and presented to Cape Cookies the invoices as per Schedule 3 of the charge sheet. Each of these invoices were also settled by

9

Cape Cookies by way of an eft payment into an ABSA bank account stated on the forged invoices.

47.   In this scenario Cape Cookies was presented with invoices for IT related expenses that originated from Jarun Trading CC trading as SolidSource (SolidSource)

48.   Neither Jarun Trading CC or SolidSource could be found to be registered with the Companies Registration Offices of South Africa.

49.   The VAT number on the SolidSource invoices was also not a valid VAT number according to the South African Revenue Services.

50.   Similarly to the Ensync and Dark Cube invoices ABSA confirmed that the bank account appearing on the SolidSource invoices was opened by Spagni and that he is also the account holder of this bank account.

51.   The bank statements received from ABSA for this account also show the eft payments that Cape Cookies made into this account in accordance with the forged invoices that Spagni presented to the accounts department for payment purporting to be from SolidSource.

60.   As in the case of Dark Cube Biometrics CC, the physical and telephonic contact details stipulated on the SolidSource invoices could not be traced by the forensic investigator or myself.

10

**Counts 328 to 378 (Schedule 4 attached to the charge sheet)**

<u>StorVault Africa</u>

61.    Within the period April 2010 to May 2011 Spagni also presented to Cape Cookies invoices that purported to be for IT related goods and/or services provided to Cape Cookies by a company called StorVault Africa.

62.    The investigation revealed that StorVault Africa was also not registered with the Companies Registration Offices of South Africa.

63.    The VAT number on the StorVault Africa invoices was also not a valid number according to the South African Revenue Services.

64.    And the physical address and telephonic contact details stipulated on the StorVault invoices could also not be traced by the forensic investigator or myself.

65.    ABSA confirmed that the bank account appearing on the StorVault invoices was opened by Spagni and that he is also the account holder of this bank account.

66.    The bank statements received from ABSA for this account also show the eft payments that Cape Cookies made into this account in accordance with the forged invoices that Spagni presented to the accounts department for payment purporting to be from StorVault.

67.    The evidence in support of the above was obtained on affidavit from

11

a. Leslie Slye, who was the Chief Financial Officer of Cape Cookies at the time Spagni was employed by Cape Cookies. He has already testified in the proceedings as indicated above.

b. Gary Miller, a Director of Credence Forensic Services and a forensic accountant, who assisted Cape Cookies with the forensic investigation of the matter and produced a forensic accountants report in this regard.

c. Dawid O Roberts, who worked as a consultant for Cape Cookies at the time of the dismissal of Spagni.

d. Claudette Farmer, who was employed by Cape Cookies as an accountant.

e. Jay Naik, who was employed by Ensync as Financial Manager and has already testified in the Regional Court in Cape Town in the Criminal Trial of Spagni.

f. Lynette Prinsloo on behalf of ABSA Bank SA in relation to the bank records in particular the various bank accounts and the money flow between the accounts.

## D. COMMENCEMENT OF THE CRIMINAL PROCEEDINGS

68. Subsequent to his appearance in the Magistrate's Court in Cape Town on 24 August 2017 the matter was referred to Regional Court, Cape Town on 30

12

October 2017 for trial. On each of his appearances in court Spagni was released on his own recognizance and warned by court to appear on the specified future date.

69.    The trial commenced in the Regional Court in Cape Town on 22 August 2019. Spagni was represented by an experienced criminal defence lawyer, Mr Keith Gess. It should be noted that all evidentiary material gathered during the course of the investigation was made available to the defence in accordance with SA Law.

70.    Spagni pleaded not guilty and elected not to disclose the basis of his defence. The proceedings continued on 11–12 September and 20 and 22 November 2019. During this period the testimony of the witnesses mentioned in paragraphs 22(a) and 22(e) above was completed. The proceedings were adjourned on 22 November, 2019, and Spagni was ordered to appear on 7 April 2020. Spagni was informed by the court that the trial would proceed on 8 April 2020 as well as on 19 and 20 May 2020.

71.    On 26 March 2020 South Africa was subjected to a national lockdown in terms of the Disaster Management Act, No.57 of 2002 as a result of the worldwide COVID 19 pandemic. In Spagni's absence, his legal representative Mr Gess made medical representations. In the light of the medical representations and the prevailing COVID situation, it was agreed that the matter would be enrolled on 30 June 2020 for the trial to continue on 8-9 October 2020. Mr Gess undertook to advise Spagni accordingly.

13

72.   The matter was, however, placed on the roll on 7 October 2020 at the request of Spagni's legal representative. The Court was presented with further medical representations dated 29 September 2020 from Spagni's doctor that it was not in Spagnis best interests for medical reasons to travel from his residence in Plettenberg Bay to Cape Town (a distance of just over 500 kilometres) for his court appearance in October 2020.

73.   The matter was then postponed in Spagni's absence to 4 November 2020 to enable Spagni to provide the court with a physician's report as to his condition and his travelling to Cape Town in the light of the COVID risk.

74.   On 4 November 2020 Spagni was again absent. Once again Spagni indicated via his lawyer that he was unable to travel and that he could not get an appointment with a specialist physician., Dr Roos, to confirm the reasons.

75.   It was then agreed by the parties that the matter be postponed to 24 and 25 March 2021 and 19 April 2021 for the continuation of the trial in the physical presence of the accused. When the dates were set there were no arrangements for the trial to be continued on a virtual platform. The Regional Court, Cape Town was neither equipped nor in the practice of conducting criminal trials and the requisite presentation of evidence by virtual means at that time. Spagni did not in any event to request that the trail be continued by virtual means. There was no indication from Spagni that he would in the USA at that time or that he would be anywhere else but in Cape Town, South Africa. His lawyer had indicated that Spagni would in fact consult his doctor as to what protocol would

14

need to be observed for his safety both in travelling to Cape Town and his attendance at court.

76.    On 24 March 2021, Spagni was again absent. His lawyer, Mr Gess stated that he had no instructions from his client and he did not know his whereabouts. He had tried contacting him telephonically but his calls were unanswered. The matter was postponed until 19 April 2021 in order for me to trace Spagni. I attempted to trace Spagni as per my statement hereto attached as **ANNEXURE "B1"**. As Spagni could not be traced, the prosecutor, Adv Tillette Berry approached the Magistrate for the district of Cape Town and a J50 warrant of arrest was issued by the Magistrate for the district of Cape Town (attached hereto as **ANNEXURE B2**).

77.    The purpose of the warrant was to secure Spagni's attendance at court for purposes of continuing the trial, where all other attempts had failed.

78.    It is significant to note that it appears the petition for non-immigrant worker on behalf of Spagni was received in the United States on 28 September 2020 and reflects a notice date of 7 October 2020. At the very same time in South Africa, Spagni was presenting medical certificates to the Regional Court, Cape Town, that he was unable to travel and that to do so would be life-threatening.

79.    In other words, the application was being made for him to travel as non-immigrant worker to the United States of America, whilst trial days were lost on account of his not being able to travel from Plettenberg Bay to Cape Town,

15

which commute would not entail crossing any international borders and which did not necessitate air travel.

## E.    IDENTITY OF THE ACCUSED

80.    **ANNEXURE "B2"** contains a photograph of Spagni.

I know and understand the content of this declaration.

I have no objection to taking the prescribed oath.

I consider the prescribed oath to be binding on my conscience.

**SIGNED** at **CAPE TOWN** on this 27th of August 2021

_Pritchard_

**STEVEN PRITCHARD**

I certify that the above statement was taken by me and that the deponent has acknowledged that she knows and understands the content of this statement.

This statement was sworn to before me and the deponent's signature was placed thereon in my presence at **CAPE TOWN** on this 27th day of August 2021.

...................................................

(MS) J PIENAAR

EX- OFFICIO COMMISSIONER OF OATHS

16

CHIEF CLERK

DIRECTOR OF PUBLIC PROSECUTIONS: WESTERN CAPE

115 BUITENGRACHT

CAPE TOWN

8001

17

MAITLAND CAS 328/08/2012

Steven Pritchard declares under oath and in English.

(1)

I am a Sargent in the South African Police stationed at Maitland Detectives with persal no. 70098701.
Contact number 0837417983 / 0215069400.

(2)

Riccardo Paolo Spagni is accused of taking R1 453 561.47 from the complainant by creating factious companies as well of changing the bank account number of one company while employed by the complainant.

(3)

The accused failed to appear for his court appearance on 2021/03/24 and his whereabouts where unknown.

(4)

I was then tasked to locate and warn the accused for court on 2021/04/19 by way of a SAPS496 warning to appear in court.

(5)

I had called his contact number ▮▮▮▮▮ and informed the person calling herself "Kim" that I would be at his home address ▮▮▮▮▮ on 2021/03/29 at approx. 12:00 to serve the summons. She confirmed the address as that of the accused.

(6)

On 2021/03/30 I again called ▮▮▮▮▮ to confirm the date. I was then told by Kim that the accused was out of the country but she had contacted the accused and will get back to me. By 16:00 I had received no reply and called again. The phone was not answered. The call was then returned later and Kim alleged that she did not know where the accused was or when he would be returning. I explained to her that I would still be going to the address. She then stated that another person was living at the address now called "Livin".

(7)

On 2021/03/31 at approx. 11:30 I arrived at ▮▮▮▮▮ At first there was no answer (the premises has security cameras on the gate). As I was about to leave the gate opened as there was workmen about to leave. I approached the women who identified herself as "Livia". She stated to me she was renting the premises for about 2 weeks and did not know anything about the accused. When asked for a statement she declined to be involved but provided her cell number ▮▮▮▮▮ I approached a neighbour at the house on the left who was putting rubbish out but the women did not respond to me and walked into the premises and closed the gate.

(8)

I then proceeded to Dr Nel, at ▮▮▮▮▮ He had issued a note that the accused could not travel due to co-morbidities in September 2020. The address of the accused was again confirmed as 15 Oriental Place but he had not seen the accused since 2020 when he did the note.

(9)

I again called ▮▮▮▮▮ and again I had the same result as before wrt to the accused been out of the country, not knowing when he would be back etc. But on further questioning "Kim" let slip that the accused cousin was staying at the house. A fact that "Livia" failed to mention.

(10)

I have explained to the persons I spoke to that I merely want to serve the summons on him personally and that he needs to get in contact with me. If not then a warrant for his arrest might be issued for him. I also stated the date that he would have to be in court as 19 April 2021

(11)

True caller an app for android phone identifies the number as Ricardo Spagni.

(12)

▮▮▮▮▮ is linked to a company called "The Spagnis" (CIPC no. K2013133840) which in turn is linked to a website called openrigs.com (site is offline). The sole director of "The Spagnis" is Ricardo Paolo Spagni ▮▮▮▮▮

(13)

https://globalcrypto.tv/richest-people-in-crypto-2020/ mentions the accused by name amongst billionaires (they do state they do not know his actual net worth).

The accused is active in crypto currency and I fail to see how he could leave the country and leave his personal phone number with a person that cannot seem to get hold of him or knows where he actually is.

(14)

I have explained to the persons I spoke to that I merely want to serve the summons on him personally and that he needs to get in contact with me. If not then a warrant for his arrest might be issued for him. I also stated the date that he would have to be in court as 19 April 2021

*Prtol*
*7009976 1 55*

(15)

Using the SAPS database I located a possible family member named Paolo Spagni who resides ███. I obtained the persons ID number and preformed a GACS (Global access database) which provides a search of the population registry, SAPS database, Natis and deeds and found that the person purchased a premises in a complex called ██████████████████ in 2016. I also found that the accused and Paolo Spagni shared a common address in Johannesberg at one time.

(16)

On 2021/04/01 I called the number ██████ and spoke to the person Paolo Spagni who stated he was the father of the accused. He alleged that the accused had immigrated again I explained the circumstances for my call an again I was informed that he would get hold of the accused.

(17)

By 2021/04/05 I had received no reply. I tried calling ██████ but the phone did not even ring. I called "Livin" as I wanted to find out by her if her surname was Spagni as during the search I located a Livia Spagni that resided in PE and that via social media facebook she was connected to Paolo Spagni. "Livia" is not a common name. I could not get through either.

(18)

On 2021/04/08 I again called ██████ the phone rang but no answer. I called ██████ and the person alleged she was not "Livia" and hung up. On 2021/03/31 I had confirmed the phone number with "Livia" in Plettenberg Bay as she had corrected me with the amount of "2" in the number. I called ██████ the accused number and asked Kim why she did not tell me the accused allegedly immigrated. She alleged she did not know but she will again send an email to him.

(19)

At this stage I do not know the whereabouts of the accused. All the people I have spoken to are un-cooperative. I was led to believe the accused was still in the country then out of the country now he has immigrated.

(20)

At this stage the accused is surely aware that I am looking for him. Yet no effort has been made on his part to contact me or at least contact the people I have spoken to, to relay a message to me. The accused sought a doctor's recommendation that he not travel due to co-morbidities to the COVID-19 virus for his previous court appearance yet it is alleged that he is either out of the country or immigrated despite the pandemic still been present.

(21)

A J50 warrant is requested in order to circulate the accused as wanted as his current whereabouts are unknown.

(22)

*THE FACTS CONTAINED IN THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY MEMORY AND KNOWLEDGE. I AM AWARE THAT IF I SHOULD OMIT SOMETHING OR STATE A FACT THAT IS UNTRUE OR BELIEVE TO BE UNTRUE I AM LIABLE TO BE CRIMINALLY PROSECUTED.*

(23)

*BEFORE I HAVE GIVEN THE ABOVE STATEMENT I HAVE BEEN INFORMENED THAT IF A PERSON IS ARRESTED AND CRIMINALLY PROSECUTED WITH REGARD TO THE STATEMENT I HAVE GIVEN. THE SAID PERSON IS THEN ENTITLED TO A COPY OF THE STATEMENT I HAVE GIVEN. ENABLING THE PERSON TO ACQUIRE LEGAL ADVICE AND TO DEFEND THEMSELVES AGAINST THE CHARGES IN A COURT OF LAW.*

(24)

I know and understand the contents of this declaration.
I have no objection to taking the prescribed oath.
I consider the oath as binding on my conscience.

PLACE: MAITLAND
DATE: 2021/04/08
TIME: 09:00

2000201 SGT SO PRITCHARD

SIGNATURE

I certify that the above statement was taken by me and that the deponent has acknowledged that he knows and understands the contents of this statement. This statement was sworn to before me and deponent's signature was placed thereon in my presence at MAITLAND on 2021/04/08 at 09:00

SIGNATURE

COMMISSIONER OF OATHS

SAPS MAITLAND 236
VOORTREKKER
RD. MAITLAND



00062

| Police Station: MAITLAND | CAS No: 328/08/2012 | Case No. F/93/2017 |
|---|---|---|
| Name: Riccardo Paulo Spagni | | |
| Address: Unknown to state | | |
| Gender: Male | | Age: 38 |

To *The Magistrate/Justice of the Peace, District of THE CAPE

### APPLICATION UNDE SECTION 43 OF ACT 51 OF 1977
### FOR WARRANTOFARREST

Application is hereby made for the issue of a warrant for the arrest of:

**Riccardo Paulo Spagni** on the charge of **FRAUD** there beings from information taken upon oath a reasonable suspicion that he committed the alleged offence on or about the **27** day of **AUGUST** year **2012** in the District of **THE CAPE**

The said **Riccardo Paulo Spagni** is at present known or suspected on reasonable grounds to be within the District of **THE CAPE**

CAPE TOWN

2021 -04- 19

CAPE TOWN

...........................T  ........................
*Director-of-Public-Prosecutions/Public Prosecutor/Police Officer
AUTHORITY
Adv T Bern  STU/DPP      Cape Town—  (021- 4872000 )

### WARRANTOF ARREST
(TO ALL PEASCE OFFICERS AUTHORISED TO EXECUTE WARRANTS OF ARREST)

1. Whereas from written application by **SENIOR PUBLIC PROSECUTOR** there is a reasonable suspicion that Riccardo Paulo Spagni of **Unknown to state** (address) on the **27** day of **AUGUST** year 2012 committed the crime of **FRAUD**. You are hereby directed to arrest him before a lower court (viz court in accordance with the provisions of section 43 of the Criminal Procedure Act, 1977 (Act 51 of 1977).

2. The accused must be informed that he has the right to consult with a legal practitioner of his choice, and if he cannot afford a legal practitioner, he may apply for legal aid a the local Legal Aid Officer.

Given under my hand at **CAPE TOWN** this ........... day of ............................ ...Year....................

MAGISTRATE
Private Bag X0017, Cape Town 0000

2021 -04- 19

*Magistrate/Justice of the Peace
CAPE TOWN
MAGISTRATE'S COURT

Description of accused:



MAGISTRATE
Private Bag X0017, Cape Town 0000

2021 -04- 1 9

TWO
CAPE TOWN
MAGISTRATE'S COURT



# FRAUD

**306 Definition** Fraud is the unlawful and intentional making of a misrepresentation which causes actual prejudice or which is potentially prejudicial to another.1

1    Snyman *Criminal* Law 531; Burchell *Principles of Criminal Law* 833. The traditional definition of fraud described the crime as "a wilful perversion of the truth made with intent to deceive and resulting in actual or potential prejudice to another": Gardiner and Lansdown *Criminal Law and Procedure* 2 1735, followed *inter alia,* in *R v Jones & More* 1926 AD 350 352; *R v Davies* 1928 AD 165 170; *R v Henkes* 1941 AD 143 161; *S v Heller* (2) 1964 1 All SA 477 (W); 1964 1 SA 524 (W) 537; *S v Shaban* 1965 4 All SA 226 (W); 1965 4 SA 646 (W) 649; *S v Isaacs* 1968 1 All SA 20 (D); 1968 2 SA 187 (D) 188. As Milton *Criminal Law and Procedure* 2 702 fn 1 points out, "perversion of the truth" sounds Victorian, and merely means that there must be a misrepresentation. An intention to deceive is insufficient for fraud; an intention to defraud (which is something quite different) is required. See par 331 post. Solomon J's definition in *R v Nay* 1934 TPD 52 54 is preferable: "Fraud consists of a false representation deliberately made with the intention of being acted upon by another to his detriment." Cf also the definitions enunciated in *R v Sedat* 1916 TPD 431 435–436 and *R v Joffe* 1934 SWA 108 110. De Wet and Swanepoel *Strafreg* 388 would



like fraud to be regarded as deceiving another person, thus inducing that person to act in a manner injurious to his or her proprietary interests. This definition is substantially similar to the more formal one in the 2 ed of this work 410; it does not reflect current law, as it excludes the crime from cases where the prejudice is non-proprietary or only potential. VerLoren van Themaat *Diefstal en Bedrog* 161 defines fraud as an intentional and unlawful distortion or concealment of the truth which is calculated to cause prejudice. The definition in the text agrees substantially with that of Milton 702, according to whom "fraud consists in unlawfully making, with intent to defraud, a misrepresentation which causes actual prejudice or which is potentially prejudicial to another"; the definition in the text was substantially applied in *S v Myeza* <u>1985 4 All SA 326 (T)</u>; 1985 4 SA 30 (T); *Ex parte Lebowa Development Corporation Ltd* <u>1989 4 All SA 492 (T)</u>; 1989 3 SA 71 (T) 101; *S v Van den Berg* 1991 1 SACR 104 (T); *S v Campbell* <u>1991 3 All SA 888 (Nm)</u>; 1991 1 SACR 503 (Nm).



# FORGERY

**317 Definition and general character** Forgery is committed by unlawfully creating a false document with intent to defraud to the actual or potential prejudice of another.1 It is a species of fraud.2 In forgery the misrepresentation takes place by way of the falsification of a document. Apart from this, all the requirements of the crime of fraud must be present, such as the intent to defraud3 and the actual or potential prejudice.4 However, whereas fraud is completed only when the misrepresentation has come to the notice of the representee,5 forgery is completed the moment the document is falsified.6 If the document is then brought to the attention of others, a separate offence is committed, namely uttering the document.7 Because the person who falsifies the document is in most cases also the one who offers it to another, it has become customary to charge that person with both forgery and uttering, which are two distinct offences.8

The crime of forgery was formerly not known *eo nomine* at common law. Depending on the type of document involved, instances of forgery were treated as different forms of *falsitas*.9 The recognition of the two separate crimes, forgery and uttering, is the result of the influence of English law.10

1      Snyman *Criminal* Law 540. This definition is in substantial agreement with that of Gardiner and Lansdown *Criminal Law and Procedure* 5 ed 2 1747 and Milton *Criminal Law and Procedure* 2 740. Gardiner and Lansdown's definition reads: "Forgery is the making of a false document with intent to defraud resulting or calculated to result in some prejudice to another." This definition was followed in *R v Muller* 1953 2 All SA 86 (T); 1953 2 SA 146



(T) 148A. In *R v Jolosa* 1903 TS 694 700, *Crowe v R* 1904 TS 581 583 and *R v Lin Yunn Chen* 1908 TS 634 637 it was succinctly stated that the essentials of the crime of forgery are a false document, an intention to defraud, and the possibility of prejudice to a third person. For further brief definitions, see *R v Sedat* 1916 TPD 431 435; *R v Joffe* 1934 SWA 108 110; for similar definitions to those in Gardiner and Landsdown see Burchell *Principles of Criminal Law* 845.

2      *R v Slater & Base* (1901) 18 SC 253 256; *R v Jolosa* supra 699; *R v Sedat* supra 435; *R v Hymans* 1927 AD 35 37 38; *R v Wessels* 1933 TPD 39 41; *R v Leibrandt* 1939 WLD 377 382; *Dormehl v S* 1966 1 PH H223 (A) 389.

3      Par 314 ante.

4      Ibid.

5      Par 316 ante.

6      *R v Hymans* supra 38.

7      Fn 8 infra.

8      *R v Hymans* supra 38; *S v Joubert* <u>1961 4 All SA 259 (O)</u>; 1961 4 SA 196 (O) 199–200; *S v Van Niekerk* <u>1980 3 All SA 465 (O)</u>; 1980 1 SA 594 (O). Cf, however, the remarks of Curlewis JP in *R v Reynolds* 1924 TPD 607 608, according to whom forgery and uttering, even when charged separately, actually constitute one crime, because the accused has one continuous intention.

9      D 48 10; Matthaeus *De Criminibus* 48 7 1; Damhouder *Practijcke in Criminele Saecken* h 110; Carpzovius *Rerum Criminalium* 2 93; Huber *HR* 6 7 4; *R v Sedat* supra 435–436; *S v Banur*



*Investments (Pty) Ltd* <u>1970 4 All SA 5 (A)</u>; 1970 3 SA 767 (A)

770G.

10    See the exposition by Innes CJ in *R v Hymans* supra 38–39 of the

history of prosecutions for these crimes in SA.



# UTTERING

**378 Description of uttering** The crime of uttering a false document is committed when a person unlawfully offers, passes off or communicates a forged document with the intent to defraud, to the actual or potential prejudice of another.1

In most cases the person who utters the document is the one who forged it, and he or she will be charged with two offences, namely forgery and uttering.2 If the person who utters the document is somebody other than the one who forged it, he or she will be charged only with uttering.3 Uttering, like forgery, is a species of fraud, and the elements of prejudice and intention to defraud are similar to the corresponding elements in the crime of fraud.4 The requirement of a false document is the same as in forgery.5

The only element in the definition of this crime which does not also form part of the definition of forgery is the "passing-off " of the document. This means that the document is communicated to another person by, for example, an offer, delivery or attempt to make use of it in some way. The person who utters the document must hold it out to be genuine.6 and therefore the mere handing over of a false document by a forger to an accomplice, who is aware of the fact that it is a forged document and who has not yet uttered the document, does not constitute uttering.7 If the document does not reach the person to whom it is addressed (for instance where a letter is lost in the post), there is only attempted uttering.8 Passing-off of the document can take place through the instrumentality of some other person or agent.9 It is immaterial whether the person to whom the document is uttered is in fact misled thereby.10



1   Snyman *Criminal* Law 535. See Milton *Criminal Law and Procedure* 2 750; *S v Van Niekerk* 1980 3 All SA 465 (O); 1980 1 SA 594 (O).

2   *R v Hymans* 1927 AD 35 38.

3   *R v Hymans* supra 40. Forgery and uttering are two separate offences: *S v Joubert* 1961 4 All SA 259 (O); 1961 4 SA 196 (O) 199-200. Only a false document can be uttered. See *S v Redelinghuys* 1990 1 SACR 440 (W).

4   *R v Kruger* 1950 1 All SA 475 (O); 1950 1 SA 591 (O) 594. See pars 363-373 ante. 5   Pars 375-376 ante.

6   *Kolia v R* 1937 NPD 105 108-109.

7   *Kolia v R* supra: *S v Latib* 1968 1 All SA 334 (T); 1968 1 SA 177 (T). Cf *R v Toni* 1949 1 All SA 327 (A); 1949 1 SA 109 (A) 114-115.

8   Milton 752.

9   *R v Joffe* 1934 SWA 108 109.

10   *S v Latib* supra 178H. Cf *R v Seabe* 1927 AD 28 32; *R v Dyonta* 1935 AD 52 57; *Kolia v R* supra 109.



**Provisions of section 59(1) of the *Value Tax Act, No. 89 of 1991***

**Offences and penalties in regard to tax evasion**

59. (1) Any person who with intent to evade the payment of tax levied under this Act or to obtain any refund of tax under this Act to which such person is not entitled or with intent to assist any other person to evade the payment of tax payable by such other person under this Act or to obtain any refund of tax under this Act to which such other person is not entitled-

(a) makes or causes or allows to be made any false statement or entry in any return rendered in terms of this Act, or signs any statement or return so rendered without reasonable grounds for believing the same to be true; or

(b) gives any false answer, whether verbally or in writing, to any request for information made under this Act by the Commissioner or any person duly authorized by the Commissioner or any officer referred to in section 5(1); or

(c) prepares or maintains or authorizes the preparation or maintenance of any false books of account or other records or authorizes the falsifications of any books of account or other records; or

(d) makes use of any fraud, art or contrivance whatsoever, or authorizes the use of such fraud, art or contrivance; or

(e) makes any false statement for the purposes of obtaining any refund of or exemption from tax; or

(f) receives, acquires possession of or deals with any goods or accepts the supply of any service, knowing or having reason to believe that the tax on the supply of the goods or service has been or will be evaded; or

(g) knowingly issues any tax invoice, credit note or debit note required under this Act which is in any material respect erroneous or incomplete; or

(h) knowingly issues any tax invoice showing an amount charged as tax where the supply in respect of tax will not take place,

(i) for the purposes of section 16 (2), fabricates, produces, furnishes or makes use of any tax invoice, debit note, credit note, bill of entry or other document contemplated in that section knowing the same to be false,

shall be guilty of an offence and liable on conviction to a fine or to imprisonment not exceeding 60 months.



(2) Whenever in any proceedings under this section it is proved that any false statement or entry has been made in any return rendered under this Act by or on behalf of any person or in any books of account or other records of any person, that person shall be presumed, until the contrary is proved, to have made that false statement or entry or to have caused that false statement or entry to be made or to have allowed it to be made with intent to evade the payment of tax or to obtain a refund of tax to which that person is not entitled, as the case may be, and any other person who made any such false statement or entry shall be presumed, until the contrary is proved, to have made such false statement or entry with intent to assist the first- mentioned person to evade the payment of tax or to obtain a refund of tax to which he is not entitled.

(3) A conviction for an offence in terms of this Act shall not exempt the person convicted from the payment of any tax, additional tax, penalty or interest payable in accordance with the provisions of this Act.



**EXTRACT** – Section 276 of the Criminal Procedure Act, No. 51 of 1977

### 276    Nature of punishments

(1) Subject to the provisions of this Act and any other law and of the common law, the following sentences may be passed upon a person convicted of an offence, namely-

*(a)*    ......

    [Para. *(a)* deleted by s. 34 of Act 105 of 1997.]

*(b)*    imprisonment, including imprisonment for life or imprisonment for an indefinite period as referred to in section 286B (1);

    [Para. *(b)* substituted by s. 3 of Act 107 of 1990 and by s. 20 of Act 116 of 1993.]

*(c)*    periodical imprisonment;

*(d)*    declaration as an habitual criminal;

*(e)*    committal to any institution established by law;

*(f)*    a fine;

*(g)*    ......

    [Para. *(g)* deleted by s. 2 of Act 33 of 1997.]

*(h)*    correctional supervision;

    [Para. *(h)* added by s. 41 *(a)* of Act 122 of 1991.]

*(i)*    imprisonment from which such a person may be placed under correctional supervision in the discretion of the Commissioner or a parole board.

    [Para. *(i)* added by s. 41 *(a)* of Act 122 of 1991 and substituted by s. 20 of Act 87 of 1997.]



(2) Save as is otherwise expressly provided by this Act, no provision thereof shall be construed-

(a) as authorizing any court to impose any sentence other than or any sentence in excess of the sentence which that court may impose in respect of any offence; or

(b) as derogating from any authority specially conferred upon any court by any law to impose any other punishment or to impose any forfeiture in addition to any other punishment.

(3) Notwithstanding anything to the contrary in any law contained, other than the Criminal Law Amendment Act, 1997 ( Act 105 of 1997 ), the provisions of subsection (1) shall not be construed as prohibiting the court-

(a) from imposing imprisonment together with correctional supervision; or

(b) from imposing the punishment referred to in subsection (1) (h) or (i) in respect of any offence, whether under the common law or a statutory provision, irrespective of whether the law in question provides for such or any other punishment: Provided that any punishment contemplated in this paragraph may not be imposed in any case where the court is obliged to impose a sentence contemplated in section 51 (1) or (2), read with section 52, of the Criminal Law Amendment Act, 1997.



**EXTRACT** – Section 18 of the Criminal Procedure Act, No. 51 of 1977

**18      Prescription of right to institute prosecution**

The right to institute a prosecution for any offence, other than the offences of-

*(a)*      murder;

*(b)*      treason committed when the Republic is in a state of war;

*(c)*      robbery, if aggravating circumstances were present;

*(d)*      kidnapping;

*(e)*      child-stealing;

*(f)*      rape or compelled rape as contemplated in sections 3 or 4 of the Criminal Law (Sexual Offences and Related Matters) Amendment Act, 2007, respectively;

*(g)*      the crime of genocide, crimes against humanity and war crimes, as contemplated in section 4 of the Implementation of the Rome Statute of the International Criminal Court Act, 2002; or

*(h)*      trafficking in persons for sexual purposes by a person as contemplated in section 71 (1) or (2) of the Criminal Law (Sexual Offences and Related Matters) Amendment Act, 2007; or

*(i)*      using a child or person who is mentally disabled for pornographic purposes as contemplated in sections 20 (1) and 26 (1) of the Criminal Law (Sexual Offences and Related Matters) Amendment Act, 2007,

shall, unless some other period is expressly provided for by law, lapse after the expiration of a period of 20 years from the time when the offence was committed.